## YOUNG *v.* UNITED STATES.

1. Cotton owned by a British subject, although he never came to this country, was, if found during the rebellion within the Confederate territory, a legitimate subject of capture by the forces of the United States, and the title thereto was transferred to the government as soon as the property was reduced to firm possession.

2. Within two years after the rebellion closed, if he had given no aid or comfort thereto, he could, under the act of March 12, 1863 (12 Stat. 820), have maintained a suit in the Court of Claims, to recover the proceeds of his cotton so captured which were paid into the treasury.

3. If he furnished munitions of war and supplies to the Confederate government, or did any acts which would have rendered him liable to punishment for treason had he owed allegiance to the United States, he gave aid and comfort to the rebellion, within the meaning of that act, and was thereby excluded from the privileges which it confers.

4. By giving such aid and comfort, he committed, in a criminal sense, no offence against the United States, and he was therefore not included in the pardon and amnesty granted by the proclamation of the President of Dec. 25, 1868 (15 Stat. 711).

APPEAL from the Court of Claims.

This suit arises under the Abandoned and Captured Property Act (12 Stat. 820), and comes into this court by appeal from the judgment of the Court of Claims against John Young, trustee in bankruptcy of Alexander Collie, upon the following finding of facts: —

"I. Said Collie was a subject of the Queen of Great Britain and Ireland, at one time residing in Manchester, England, as a member of the firm of Alexander Collie & Co., but in the years 1862, 1863, and 1864, residing and doing business, in his own name, in London, England, and he has at no time been in the United States.

"II. In the year 1862, the said Collie engaged in fitting out, lading, and sending steamships to run the blockade of the ports in

States which were then in rebellion against the United States; and for about two years he continued engaged in that business, sending a large number of such vessels for that purpose, which succeeded many times in running the blockade, in and out, and carried into some of those ports general merchandise, which was there sold, and also munitions of war, to wit, arms, gunpowder, armor-plates for war-vessels, army-clothing, cannon, shot, ammunition, and quartermaster and medical stores, which were purchased in England by said Collie, or by agents of the so-called Confederate States of America, to whom, in aid of such purchases, the said Collie made large advances of money; and when said munitions of war were run into said ports, they were delivered to the government of said Confederate States. The vessels so engaged in running the blockade took back from said ports, to said Collie, large quantities of cotton, partly received from said government in payment for the munitions of war, and other things received from him, and partly bought for him by his agents in those States, with moneys derived from the sales there of the cargoes of merchandise taken into said ports by the ships of said Collie. The cotton, for the recovery of the proceeds of which this suit was brought, was purchased by said Collie's agent in the said Confederate States, with moneys so derived.

"The said Collie, on the 1st of October, 1863, addressed the following letter to John White, special commissioner for the State of North Carolina, then·in England: —

"'No. 1.]          ·                    22A Austin Friars, London,
                                        "'1st October, 1863.
"'John White, Esq.,
     "' *Special Com'r for North Carolina:*
     "'Dear Sir, — Being desirous of aiding in any way in my power the government of your State in its present struggle, it seems to me that the time has come when this can be done very efficiently, and, with this view, I now ask your careful consideration of the following propositions: —
     "'From all I can learn, the chief requirement of your country at the present moment, as far as concerns business here, is to receive supplies of railway iron, rolling-stock, and a few other articles, with regularity, expedition, and economy. To effect this I propose —
     "' *First,* To furnish, with as little delay as possible, four steamers, of the most suitable description for blockade-running, of which your State will own one-fourth interest, the other three-fourths being held by myself and friends.

"' *Second*, To give up to the government of your State, when required, the entire inward carrying-power of said steamers from the island to the Confederacy, at a moderate rate, to be fixed hereafter.

"' *Third*, That the government of your State be entitled to one-fourth space of the outward carrying-power of each steamer, for cotton or other produce; and this arrangement will, I estimate, yield to your State funds sufficient to pay cost and all charges on inward cargo, cash of its share of outward cargo, and (if cotton of good quality be sent out) a very large surplus will be left at the credit of your State on each trip. If at any time there should be a deficiency of cargo for government or other account, freight will be taken, if procurable, from other parties, and a due share of any freight so carried will be credited to the State. In a business such as that now sought to be inaugurated, it is manifestly impossible to provide for all contingencies which may arise: all I can at present do is to indicate the chief aims, objects, and conditions. The rest must be left to the good faith and honorable dealing of the government of your State on the one part, and of myself on the other. I need hardly add, that any proposition from your government for altering or amending any of the conditions you and I may agree to will be met by me in the most liberal spirit, and that I place the same implicit confidence in the good faith of the governor and government of your State I ask them to place in me.

"' I remain, dear sir, yours faithfully,

(Signed)       .'' ALEX. COLLIE.

"On the 27th of October, 1863, the said Collie and the said White entered into the following agreement:—

"' With the view of carrying out efficiently the business indicated in the preceding letter of 1st instant, it is hereby agreed by Alexander Collie, for. himself and friends, on one part, and John White, of North Carolina, for the governor of that State, on the other part, that Alexander Collie will furnish four steamers of suitable construction and speed, as soon as practicable; that one-fourth interest in each of these steamers will belong to the government of North Carolina, three-fourths owned by Alexander Collie and friends. The government will pay their share of the costs and outfit of such steamers by cotton-warrants (Manchester issue), at par, and the working expenses of such steamers will be paid by the respective owners, in their due proportion; that is, one-fourth of the working expenses will be paid by the government of North Carolina, and

three-fourths by the other owners; and if from any sufficient cause it should be deemed prudent to sell any of the steamers, the net proceeds of such sale, or any money earned, in the shape of freight, will be duly credited in like proportion. Under this contract the "Hansa" and the "Don," both most excellent boats, now running between Wilmington and the islands, will, on next arriving at the islands, be made over to the State, in the proportion of one-fourth interest in each; and these steamers will be charged, £20,000 sterling for the "Hansa," and £20,000 sterling for the "Don," this being the estimated total cost price of each at the islands, and considerably under the estimated value. Another screw-steamer, similar to the "Ceres," will be ready for sea in about four weeks, and in about two months the fourth will be despatched. By this arrangement, the chief objects sought to be obtained are, —

" ' *First*, To supply railway iron and rolling-stock, and such other articles as may be needed by the State, at a moderate rate of freight, and in regular quantities.

" ' *Second*, To run out regularly a quantity of cotton for the State, to enable it to benefit from the very high prices ruling here.

" ' *Third*, To reduce the risk of capture as much as possible by dividing the interest of the government over four or more steamers. In order to secure the greater economy, and the more efficient working facilities, the working management of the steamers will rest in the hands of Alexander Collie & Co., who, as representing the larger proportion, will appoint the captains and officers; but no important steps, such as disposing of any of the steamers, or replacing any of them, or adding to their number, will be undertaken without the full knowledge and consent of Mr. White, the special commissioner here. Under this arrangement, the parties interested will have the benefit of a well-trained and experienced staff of men, at all points, and the government of the State, on its part, will give all the aid in its power to the efficient working of the business now inaugurated. It will give all the aid it can do to get transportation of cotton from the interior when required, and it will guarantee the undertaking from any restrictions or impediments being thrown in the way of full cargoes being obtained for each steamer of cotton or other produce with the least possible delay. The inward carrying-power of the steamer from the islands will be at the service of the State, at the rate of £5 per ton, payable at the islands, for railway iron and rolling-stock (one-fourth of which will be duly credited to the State as its interest), and arrangements will be made immediately to lay down one thousand tons of railway iron at the

islands for this purpose. For fine goods, the rate will be £30 per ton.

" ' The government of the State will be the owners of outward cargo to the extent of one-fourth. Their cargoes will be purchased by the agents of Alexander Collie & Co., subject to the inspection of the government of the State, who will be debited for one-fourth of the amount, and on safe arrival in England one-fourth of the proceeds will be duly credited to the State. The commission chargeable on this business will be the usual one of two and a half per cent on purchases and realizing, and five per cent on ships' disbursements, in addition to the usual brokerage, and such charges as incurred at the islands for transshipment and storing. The government will of course have the option of putting on board their own shares of the cotton; but for many reasons this is hardly desirable. If they do so, however, the buying commission of two and a half per cent will be avoided. In cases when Alexander Collie & Co. come under cash advances for account of the State (in place of putting the cotton-warrants in the market), Alexander Collie & Co. will be entitled to a further commission of two and a half per cent for the amount of such advance, — interest at the rate of five per cent to be charged, and the same rate to be allowed when there is cash in hand. This agreement to be in force till the steamers are sold, captured, or destroyed.

(Signed)                    " ' ALEX. COLLIE.
(Signed)                    " ' JOHN WHITE,
                " ' Commissioner for the State of North Carolina.
" ' MANCHESTER, Oct. 27, 1863.'

" In pursuance of this agreement, the said Collie sent out to Wilmington, N. C., four steamers loaded with shoes, army clothing, and other supplies, which he bought for account of the State of North Carolina; and he received back cotton from said State, in payment as well for the goods so sent as for the share of said State in said steamers.

" In the year 1863, the said Collie sold in London, for the State of North Carolina, obligations of that State, delivered to him for that purpose by the said John White, known as North Carolina cotton-warrants; which were obligations for the delivery of cotton at the port of Wilmington, or at other ports then in possession of the Confederate States; and the said Collie disposed in England of large amounts of said obligations, giving with them his agreement to hold himself personally responsible to the parties to whom he sold them for their payment by the State of North Carolina; and

he also took some of said obligations in payment for the goods which he shipped to that State.

"On the 13th of June, 1864, the said Collie entered into the following written contract with Colin J. McRae, agent of the government of said Confederate States: —

"'*Memorandum of agreement between Alexander Collie, of London, on the one part, and Colin J. McRae, as representing the government of the Confederate States of America, on the other part.*

"'1. Alexander Collie agrees to provide four large and powerful new steamers, to carry out the following arrangements, with the least possible delay.

"'2. Alexander Collie will at once cause to be purchased, under Colin J. McRae's directions, quartermaster's stores to the value of £150,000 sterling, and ordnance or medical stores to the value of £50,000 sterling, — the one subject to the inspection of Major J. B. Ferguson, the other to that of Major C. Huse.

"'3. The delivery of such purchases to extend over a period of about six months, in proportionate quantities, and shipment to be made to the Confederate States with as little delay thereafter as practicable.

"'4. Inland carriage and packing expenses to be charged in the invoice, and two and a half per cent commission to be chargeable also.

"'5. Colin J. McRae, on behalf of his government, agrees that, on arrival in the Confederacy of any goods purchased and shipped by Alexander Collie, under this agreement, such goods will be immediately claimed and taken over by the government. Fifty per cent advance will be added to the English invoice, and Alexander Collie, through his agent, will immediately receive in exchange cotton at the rate of 6*d.* (sixpence) sterling per pound.

"'6. Such cotton to class "middling," and to be delivered alongside the steamers as required, compressed, packed, and in good merchantable condition.

"'7. Full cargoes of cotton, received in exchange for goods delivered under this agreement, may be shipped by Alexander Collie, through his agent, free from any other charge or restriction whatever beyond the now existing export tax of one-eighth of a cent per pound.

"'8. No steamers to have priority in any way over those employed by Alexander Collie, in this service; and more than the four

above mentioned may be used, if Alexander Collie can arrange to put them on.

"'9. Colin J. McRae further agrees, that, to cover the expense of Alexander Collie's agencies abroad, he (Alexander Collie) is to have the privilege of providing and bringing out other cotton than that received under this agreement, to the extent of one-tenth part of the cargo-space of the respective steamers, and such cotton (or tobacco) may be shipped on same terms as indicated for government cotton; viz., free from all other charges or restrictions whatsoever, excepting the before-named export duty now existing.

"'10. This agreement is to be construed by both parties in a spirit of confidence and liberality. The one will purchase and send forward the supplies indicated, with the least possible delay; the other will deliver cotton as required, in the same way; and neither party will withhold necessary supplies, on account of any temporary shortcomings on the part of the other.

"'11. Alexander Collie's agents, with the necessary staff for attending to this business, are to be allowed the privilege of residing in the Confederacy, free from liability to conscription, and every reasonable facility is to be allowed them for effectually carrying out the terms of this agreement.

(Signed)　　　"'ALEX. COLLIE.

"'C. J. McRAE,

"'*Agent C. S. A.*

"'LONDON, June 13, 1864.'

"Under this contract, in the winter of 1863–64, and the spring and summer of 1864, divers steamers were supplied, and importations of supplies and munitions of war for the Confederate government were run by them into Wilmington, and return-cargoes of cotton, on account of that government and of said Collie, were run by them out of that port to England.

"In March, 1864, the said Collie sent, as a present to the Confederate authorities at Wilmington, on one of his steamers engaged in running the blockade into that port, a Whitworth gun for field service, with carriage, caisson, limbers, and all other customary appendages, together with a large quantity of shot of the proper calibre for the gun, in regard to which he wrote to the Governor of North Carolina as follows:—

"'I have shipped on board the "Edith" a new kind of gun, which is reported to be particularly destructive; and I have to ask the authorities at Wilmington to accept it as a "substitute" for

some of our people, who, but for our business, would have been doing business in another capacity.'

"This gun was received by the Confederate authorities in Wilmington, and used in defence of that port and in aiding the entry into it of blockade-running steamers, by repelling the vessels of the United States engaged in pursuing those steamers.

"In the year 1864, the said Collie sent on one of his blockade-running vessels, to the government of said Confederate States, as a gift from himself, two Whitworth guns, which were received by that government and used in its service.

"In the same year, the said Collie made a donation to that government of $30,000, to aid the needy and the suffering in the insurgent States, and more particularly those who had been made so through the war.

"III. In the years 1862, 1863, and 1864, the said Collie, through an agent in the insurgent States, sent out by him in 1862, purchased, with money derived from sales of cargoes run through the blockade into ports in those States in said Collie's steamers, 3,096 bales of upland cotton, and 1,757 bales of sea-island cotton: all of which was stored in Savannah at the time of the capture of that city by the military forces of the United States in December, 1864, and was there seized and taken by those forces, and thence shipped to New York, where it was sold by an agent of the United States, and the proceeds thereof, amounting to $950,076.71, were paid into the treasury of the United States."

The case was argued by *Mr. J. Hubley Ashton* and *Mr. W. W. MacFarland* for the appellant.

## I.

1. The legal character of the late rebellion as a geographical or territorial civil war, as distinguished from an insurrection or unorganized war, is a political and judicial fact, established by the doctrines of public law, recognized, formally or otherwise, by all the Great Powers of the world, and adjudged by every department of the government of the United States. Vattel, bk. iii. sect. 292; Bello, *Principios de Decrecho Internacional*, c. 10, p. 267; Hautefeuille, *Droits et Devoirs de Nations Neutres*, vol. i. p. 378; Bluntschli, *Revue de Droit International*, 1870, p. 455; *Opinion Impartiale sur la Question de l'Alabama*; Twiss, *Law of Nations, War*, 72; Letters

of Historicus, 132; Woolsey, Int. Law, 459; *The Prize Cases*, 2 Black, 670, 695; *Mauran* v. *Insurance Company*, 6 Wall. 1; *Thorington* v. *Smith*, 8 id. 1; *Hanger* v. *Abbott*, 6 id. 532; *Matthews* v. *McStea*, 91 U. S. 7; *New York Life Insurance Co.* v. *Statham et al.*, 93 id. 24; *United States* v. *McRae*, L. R. 8 Eq. 69; *United States* v. *Prioleau*, 2 Hem. & M. 559; Treaty of Washington; The Three Rules.

2. The relative rights and duties of foreign nations, as neutrals, and of the United States and the Confederate States, as belligerents, in the civil war, were governed by the rules of public law which define the reciprocal rights and duties of neutral and belligerent States in an international war. Grotius, de Jure Bel. ac Pac., lib. 1, c. 4, sect. 15; Hall, Rights and Duties of Neutrals, 15; Bernard, British Neutrality, 107; Wheat. Int. Law, sect. 23; Twiss, Law of Nations, War, sect. 239; Letters of Historicus, 13; Lawrence's Wheaton, p. 846, note 241; Dana's Wheaton, pp. 37, 41; *The Santissima Trinidad*, 7 Wheat. 283.

3. Commerce, on the part of neutrals, with the Confederate States was subject to be affected by the United States only in the exercise, and within the limits, of the rights which, under the public law, pertain to a belligerent in respect to neutral commerce in an international war. The law of blockade and of contraband is the same in a civil as in an international war. Grotius, de Jure Bel. ac Pac., lib. 11, c. 3, sect. 4; Lawrence's Wheaton, p. 846, note 241; *The Lisette*, 6 Rob Adm. 374; *The Treude Sostre*, id. 390; *Thirty Hogsheads of Sugar* v. *Boyle*, 9 Cranch, 191; *United States* v. *Rice*, 4 Wheat. 246; *Fleming* v. *Page*, 9 How. 603.

4. The maritime and infra-territorial commerce of neutrals with and in the territory and ports of the Confederate States was unaffected by any municipal jurisdiction, sovereignty, or legislation of the United States. Dana's Wheaton, p. 687, note 239; Correspondence between Mr. Monroe and Señor Otis, 1816, 4 Am. State Papers, 156–158; Mr. Adams to Mr. Nelson, 1823, President's Mess. and Docs., Dec. 1824, pp. 269–285; *The Georgiana and Lizzie Thompson*, 9 Op. Att'y-Gen. 140; Earl Russell to Lord Lyons, July 19, 1861, Parl. Papers, 1862, N. A. No. 1, p. 49; New Granada Civil War, Mr. Seward to

Mr. Adams, July 21, 1861 (quoting Speech of Lord Russell, June 27, 1861), Mess. and Docs., 1861–62, p. 117; Lord Russell to Mr. Stuart, Sept. 22, 1862, Papers relating to Foreign Affairs, 1862, pp. 350, 371.

5. The citizens of neutral States have the right to sell and deliver to a belligerent purchaser articles contraband of war, within neutral territory, and to export and transport such articles from the neutral to the belligerent territory (whether under maritime blockade or not) for sale to, or for the use of, the belligerent; subject only to the coexisting and conflicting right of maritime capture and prize confiscation of the peccant property, on the part of the opposing belligerent power. Vattel, bk. iii. c. 7, sect. 110; Twiss, Law of Nations, War, Pref. xvii. sect. 209; Arnould, Marine Ins. (4th ed.) 649; 3 Phill. Int. Law (ed. 1870), p. 410; 1 Kent, Com. 142; Dana's Wheaton, p. 563; Wheaton, History of Law of Nations, 312; *The Santissima Trinidad*, 7 Wheat. 283; *Seton* v. *Low*, 1 Johns. (N. Y.) Cas. 1; *Richardson* v. *Marine Insurance Co.*, 6 Mass. 113; *Ex parte Chavasse*, 11 Jur. N. S. pt. 1, 400; *The Helen*, Law Rep. 1 Ad. & Ec. 6; 3 Jefferson's Writings, 557; Mr. Hamilton's Instructions to Collectors, 1 Am. State Papers, F. R. 100; 6 Webster's Works, 452; Mr. Webster to Mr. Thompson, Ex. Doc. 27th Cong. 1841–42, vol. v., doc. 266; Message of President Pierce, Dec. 1854; Mr. Marcy to Count Sartiges, July 14, 1856, Mess. and Docs. 1856–57, p. 43; Mr. Cass to Mr. Mason, June 27, 1859, Mess. and Docs. 1859, p. 31; Mr. Seward to Mr. Romero, Dec. 15, 1862; Lord Granville's Corresp. with Count Bernstorff, For. Rels. of U. S. 1870, p. 177; Sir Edward Thornton to Lord Granville, Parl. Papers, Franco-German War, 1871, pp. 182, 204; Westlake, Commercial Blockades; Hall, Rights and Duties of Neutrals, 19, 50; De Burgh, Elements of Maritime International Law, 116; Pomeroy, Law of Maritime Warfare, N. A. Rev., April, 1872, p. 377; Contraband of War, Am. Law Rev., Jan. 1871; Kluber, Droit des Gens Modernes de l'Europe, vol. ii. sect. 239, p. 96; Reddie, Mar. Int. Law, vol. ii. p. 185; Montague Bernard, Lecture on Alleged Violations of Neutrality by England, p. 29; Letters of Historicus, p. 144.

6. Citizens of a neutral State, who violate the international

law of neutrality, unless they are found actually engaged as combatants in the war, are amenable for such offence to the sovereignty of the neutral country alone.   The right of the offended belligerent, as against them, is limited to self-defence by the capture and confiscation of the peccant property involved in the particular hostile transaction.   Hall, Rights and Duties of Neutrals, 26; Twiss, Law of Nations, War, sect. 214; Hautefeuille, Droits des Nations Neutres, vol. iii. pp. 224, 234; *Case of Analogues to Contraband, The Friendship, The Orozembo, The Atlanta,* 6 Rob. Adm. 420, 430, 440; Dana's Wheaton, p. 637, note 228; *Case of The Cagliari,* State Papers, 1857–58, p. 326; *Queen* v. *Keyn, Case of The Franconia,* Law Rep. 2 Ex. 63–252.

## II.

The cotton in question is found to have been purchased with the proceeds of sales of general merchandise, not contraband, exported by Collie from England, in the course of his maritime commerce with the Confederate States; and he acquired, by such purchase, a valid and indefeasible title to the property.   *The Sir William Peel,* 5 Wall. 517; 3 Phill. Int. Law, 742; *United States* v. *Rice,* 4 Wheat. 246.   The case is free from all such doctrine as was applied in *Sprott* v. *United States,* 20 Wall. 459, and *Whitfield* v. *United States,* 92 U. S. 165.

## III.

The proceeds are recoverable under the third section of the Captured and Abandoned Property Act of March 12, 1863.

The great proposition is, that Collie's acts, during the period of hostilities, were not acts of "aid or comfort to the rebellion," within the just meaning of the statute.   Those only who unlawfully gave "aid or comfort to the rebellion" were intended to be affected with a disability to recover the proceeds of their captured property.   The only question here is as to the legal character and quality of the claimant's acts.   This court cannot attribute criminality or illegality to an act where the law imputes none (*The Louis,* 2 Dod. 249; *The Antelope,* 10 Wheat.

66); and it would be a monstrous conclusion, that he is to suffer the loss of his property for acts which, in judgment of law, are neither criminal nor illegal. The acts of Collie were not offences against the law of nations, nor crimes or offences under the municipal law of the United States. The United States had no international right to punish him, or affect him with the actual or potential forfeiture, or appropriation, of this property, on account of any thing he did during the hostilities. His acts involved, under the public law, only a certain fixed penalty; and the United States, without transcending their power under the law of nations, and an infraction of their international obligations to him and his sovereign, could not, directly or indirectly, annex to them any other penal consequences whatever.

## IV.

In development of the foregoing propositions, we submit the following : —

1. Collie is a native-born British subject. Throughout the hostilities, he was domiciled in his own country. His international *status* was that of a neutral. His cotton, warehoused on land, in Savannah, in December, 1864, was *de jure* and *de facto* neutral property. In respect to this cotton, he was not an enemy, *de jure* or *de facto*, in any sense known to publicists. If captured at sea, independently of breach of blockade, it could not have been confiscated, in a prize court, as actually or constructively the property of an enemy of the United States. *The Venus*, 8 Cranch, 253 ; Twiss, Law of Nations, War, 300.

2. The act of March 12, 1863, is to be so interpreted and applied, as far as its language admits, as not to be inconsistent with the comity of nations, or the established rules of international law, as understood in this country. All general terms must be narrowed in construction so as to harmonize the statute with the public law. *The Charming Betsy*, 2 Cranch, 64 ; *United States* v. *Fisher*, id. 358 ; *Talbot* v. *Seeman*, 1 id. 1 ; Maxwell on Statutes, 122 ; *Queen* v. *Keyn*, Law Rep. 2 Ex. D. 63, 85, 210.

3. The subjects of neutral States were entitled, under the

public law, to stand, with respect to their captured property, upon the same footing, at least, with the inhabitants of the hostile territory, who, in judgment of law, were public enemies of the United States.   *The Prize Cases*, 2 Black, 687 ; *Mrs. Alexander's Cotton*, 2 Wall. 419.   It was not competent, therefore, for the United States, while providing for the restoration of the captured property of the latter, to appropriate like property of the former.  · Such discrimination would be a breach of. the comity of nations, and a violation of the established principles of international law.   The act of March 12, 1863, must be so construed, if possible, as to avoid such a result.

4. By the operation of that statute, and the proclamations of pardon and amnesty, as they have been given effect by this court, the United States have restored, or provided for the restoration of, the proceeds of the captured property of their enemies, rebel-enemies, and traitors in the late civil war.   If, therefore, this court should finally declare that the United States have, in effect, discriminated, by this legislation, against the subjects or citizens of friendly foreign States, whose property fell under the operation of the Captured Property Act, it would be for their governments to enforce their rights by international reclamation against the United States.   Rutherford's Institutes, vol. ii. bk. 2, c. 9, sect. 19 ; Wheaton's Life of Pinkney, pp. 193, 372; 2 Phill. Int. Law, 4 *et seq.; Lamar* v. *Browne*, 92 U. S. 187.

5. The modern public law discountenances and condemns as barbarous the capture and appropriation, as booty of war, of private commercial property, warehoused on land, in territory, like the city of Savannah in December, 1864, in the firm and safe occupation, control, and government of the invading belligerent.   1 Kent, Com. 92; Twiss, Law of Nations, War, sects. 64, 65 ; Mr. Dana's note on Distinction between Enemy's Property at Sea and on Land, Wheaton, p. 451, also p. 439 ; Bluntschli, Le Droit International Codif., sect. 656 ; Ortolan, Diplomatie de la Mer, liv. iii. c. 2.

6. This court has said that Congress recognized in this statute the enlightened maxims of the modern public law in regard to the immunity of private property on land from capture as booty of war, and that these captures were made, not for

booty, but to cripple the enemy. *United States* v. *Padelford*, 9 Wall. 531 ; *United States* v. *Klein*, 13 id. 128 ; *Haycraft* v. *United States*, 22 id. 81. The statute, in this view, has been expressly held to be a remedial statute, " requiring such a. liberal construction as will give effect to the beneficent. intention of Congress." *United States* v. *Padelford, supra.* It must receive, therefore, in every case, such an equitable interpretation as will prevent a failure of the remedy. 1 Kent, Com. 465.

7. This court cannot now decide that the capture worked a confiscation of this property, and divested absolutely the title 'and interest of the owner, without overruling all it has ever said in regard to this species of property. The solemn and explicit language of the court is, " that the title to the proceeds of property which came to the possession of the government by capture, with the exceptions already noticed, was in no case divested out of the original owner." *United States* v. *Klein, supra.*

8. The *status* of this species of property was absolutely determined by the will of Congress, as expressed in the act of March 12, 1863. *Brown* v. *United States*, 8 Cranch, 110. And the adjudicated law of this court is, that the proceeds of property taken into the custody of public officers, under that act, were impressed with a trust in favor of the former owners, and that the remedy provided for their recovery was granted, therefore, not as a matter of favor, but in performance of a duty devolving upon the government. Upon all sound principles of interpretation, therefore, the most liberal construction must be placed upon the grant of the remedy of which the words of the statute are susceptible. Vattel, bk. 2, c. 17, sect. 307.

9. The manifest policy and purpose of the statute were to impose a disability to reclaim and recover the proceeds of this species of property upon those only who committed the municipal offence of treason, or of giving aid or comfort to the rebellion, as defined by the statutes of the United States. The distinction meant to be made was between those whom the rules of international law classed as enemies ; and those only who violate their allegiance were intended to be affected

with the statutory disability. *Mrs. Alexander's Cotton*, 2 Wall. 404.

10. The words of the third section of the act of 1863, under consideration, are words of technical signification in the jurisprudence of the United States, and import the political crime of treason as known to the criminal law of the country. 2 Burr's Trial, 401; *United States* v. *Greathouse et al.*, 4 Sawyer, 472; *United States* v. *Wiltberger*, 5 Wheat. 76; *United States* v. *Palmer*, 3 id. 610; *Carlisle.* v. *United States*, 16 Wall. 147. The claimant never committed this or any other criminal offence against the United States. He never, therefore, gave "aid or comfort to the rebellion," within the meaning of the statute.

11. This court, in a long line of solemn adjudications, has, in effect, declared that the interpretation we place upon these words is the true one, and that those only who were amenable to the laws of the United States prescribing punishment for treason and for giving aid and comfort to the rebellion, and violated those laws, are to be deemed affected by this statutory penal disability. The court has construed the statute as a penal fulmination against those who were guilty of participation in the treason of the rebellion. The disability has been adjudged to be directly annexed to the offence of giving aid and comfort to the rebellion, and as a penalty for that offence; otherwise it could never have been held removable by pardon, so as to give the pardoned claimant a standing in the Court of Claims. *Mrs. Alexander's Cotton, United States* v. *Padelford, United States* v. *Klein, Carlisle* v. *United States, supra; Armstrong* v. *United States*, 13 Wall. 154; *Pargoud* v. *United States*, id. 156.

12. Upon no other view, as applied to the subjects of foreign States, is the statute conformable to the principles of international law, the rules of natural justice, or the general doctrines of the municipal jurisprudence of the United States and other civilized nations. The United States had no international right to subject citizens of foreign States, not amenable to their jurisdiction, to the treatment received by their domestic criminals.

## V. .

If it shall be held that the claimant has been excluded from the benefits of the act of March 12, 1863, by reason or on account of his acts during the war, such exclusion can be regarded in no other light than as a punishment for such acts, and thus constitutes them, however wrongfully, offences against the United States. It was competent for the President to relieve him from such punishment, and he did so by his proclamation of general amnesty of Dec. 25, 1868. 15 Stat. 712.

The power of the President to pardon is coextensive with that of Congress to punish, and includes as well the remission of penalties and forfeitures, as the removal of disabilities annexed to the commission of offences against the United States. *United States* v. *Wilson*, 7 Pet. 150 ; *Ex parte Wells*, 18 How. 307.

*Mr. Attorney-General Devens* and *Mr. Assistant-Attorney-General Smith, contra.*

## I.

While conceding the recognition of belligerent rights as belonging to both parties during the late civil war, we do not overlook the important qualification that the United States did not, by recognition of the insurgents as belligerents, abridge any of its sovereign powers, but merely waived their assertion as to persons engaged in rebellion.

Because of this state of belligerency, the United States possessed the right of capture. The seizure of this cotton was an exercise of it. *Haycraft* v. *United States*, 22 Wall. 81.

Legislation did not confer, but only modified, this right. *Smith* v. *Brazleton,* 1 Heisk. (Tenn.) 59–61 ; *Price* v. *Poynter*, 1 Bush, 388–395 ; *Mrs. Alexander's Cotton*, 2 Wall. 419, 420 ; *The Prize Cases*, 2 Black, 671 ; *Brown* v. *United States*, 8 Cranch, 122, 123, 149–151, 154 ; Upton, Mar. Warf. (1861), 87 ; No. Am. Rev. for April, 1872, 399 ; *Planters' Bank* v. *Union Bank*, 16 Wall. 483 ; *Coolidge* v. *Guthrie*, 8 Am. Law

Reg. N. s. 24; *The Emulous*, 1 Gall. 582, 583; *Gray Jacket*, 5 Wall. 369; *United States* v. *Padelford*, 9 id. 531; *Miller* v. *United States*, 11 id. 268; *Sprott* v. *United States*, 20 id. 459; *Lamar* v. *Browne*, 92 U. S. 187.

## II.

The property being captured, the title thereto vested wholly in the United States, qualified only by legislation, and to the extent that the statutes expressly declare. No man could thereafter deraign title thereto, nor claim its avails, except through the United States, and by showing the chain of circumstances which the statutes prescribed to constitute a valid claim to the net proceeds. *Lamar* v. *Browne, supra; Brown* v. *United States*, 8 Cranch, 131, per Story, J.; *The Elsebe*, 5 C. Rob. 173, 181 *et seq.; The Melomane*, id. 41, 48; *The Mary Francoise*, 6 id. 282; *The French Guiana*, 2 Dod. 151; *The Thetis*, 3 Hag. Adm. 231; *The Joseph*, 1 Gall. 558; *The Liverpool Hero*, 2 id. 188, 189; *Alexander* v. *Duke of Wellington*, 2 Russ. & M. 54; *Taylor* v. *Nashville & Chattanooga Railroad Co.*, 6 Coldw. (Tenn.) 649; Vattel, bk. 3, c. 11, sect. 229; 3 Phil. Int. Law, 209–212, sect. 130; *Haycraft* v. *United States*, 22 Wall. 81.

## · III.

The right of capture applied to the property of a non-resident alien, bought by him *flagrante bello*, and paid for by goods and munitions run through the blockade. It applied to such property as this was, from its very nature and situation, irrespective of ownership. Had its nature been different, the United States possessed the right to treat it as enemy property, if it belonged to an alien who, by the gift of money and guns to its foes, and by entering into partnership with them, had constituted himself, in fact, an enemy also; so that he could no longer rightfully claim to be considered as a neutral, even though his country were so.

The capture and retention of the property by the United States was justified on the triple ground of its ownership, its nature, and the character of the transactions in it. *Miller* v.

*United States*, 11 Wall. 311, 312; *The Prize Cases*, 2 Black, 674; *Kennett* v. *Chambers*, 14 How. 48, 49; *Price* v. *Paynter*, 1 Bush (Ky.), 392; 2 Twiss, Law of Nations, 435, sect. 215; 1 Levi, Int. Law, Introd. xlv., xlvi.; 1 Chitty, Comm'l Law, 395; Chitty's Vattel, 328, bk. 3, c. 6, pp. 96, 333, sect. 102; 3 Phillimore, Int. Law, 728; 1 Kent, Com. *80; Halleck, Int. Law, 715, sect. 25, and 720, sect. 34; *Bentzon* v. *Boyle*, 7 Cranch, 199; *The William Bagaley*, 5 Wall. 405, and citations; *Cummings* v. *Diggs*, 1 Heisk. (Tenn.) 72, 73; *The Mary Clinton*, Blatchf. Prize Cases, 560; *The Phenix*, 5 C. Rob. 21; *The Vrow Anna*, id. 161; 4 id. 119; *The Ann Green*, 1 Gall. 286, and citations; Levi, Int. Law, Introd. xliv.; Upton, Mar. Warf. c. 3, pp. 44 *et seq.*, 64, 69 *et seq.*; 1 Chitty Comm'l Law, c. 8, pp. 395 *et seq.*, 404, 406, 408 *et seq.*, and citations; Thompson, Laws of War, c. 1, sect. 2, pp. 21, 27, 28; *Miller* v. *United States*, 11 Wall. 268; 3 Phillimore, Int. Law, sect. 484, citing *The Susa*, 2 C. Rob. 255; *The Rendsborg*, 4 id. 121.

The government does not claim to punish Collie, nor to affect him with any forfeiture for an offence; but insists that the property was rightfully captured, and that a complete title thereby vested in the United States, which could do therewith as it pleased, and direct what should constitute a claim under its grant to the proceeds.

## IV.

The right to capture, absolutely and irrevocably, was at least as extensive within hostile territory as upon the high seas. The ground of seizure on the ocean is, that "it is a part of the theatre of war." De Burgh, Mar. Int. Law, 1, 2; 2 Twiss, Law of Nations, 440; 2 Wildman, Inst. of Int. Law, 1, 9; Dana's Wheaton, sect. 355, note 171; Halleck, Laws of War, 446, c. 19, sect. 1, 714, c. 29, sect. 25, 721, sect. 35; Levi, Com. Law, Introd. xliv.

The right of seizure is universal "wherever the property is found. The protection of neutral territory is an exception to the general rule only." *The Vrow Anna*, 5 C. Rob. 17.

## V.

The United States was always rightfully sovereign at Savannah, even while there as a belligerent.   It acted in the war in both capacities.   *Rose* v. *Himely*, 4 Cranch, 272; *Gelston* v. *Hoyt*, 3 Wheat. 324; *Prize Cases*, 2 Black, 673; *Miller* v. *United States*, 11 Wall. 306, and citations; *Lamar* v. *Browne*, 92 U. S. 187; *United States* v. *Diekelman*, id. 520; *Hammond* v. *State*, 3 Coldw. (Tenn.) 138; *Billgerry* v. *Branch*, 19 Gratt. (Va.) 401–403, per Rives, J.; Savigny, Int. Law, 138, c. 1, sect. 24; Westlake, Int. Law, 243, c. 8, sect. 260.

Collie's title was acquired subject to the liability of its being then and there defeated by a capture *jure belli*.   *The Santissima Trinidad*, 7 Wheat. 283.

Its acquisition by him violated the rights and public policy of the United States as a sovereign, as well as its belligerent rights.   *Kennett* v. *Chambers*, 14 How. 38, 50–52; *Totten* v. *United States*, 92 U. S. 105; *Whitfield* v. *United States*, id. 165; *Desmare* v. *United States*, 93 id. 605; *Sprott* v. *United States*, 20 Wall. 459; *The Ann Green*, 1 Gall. 287.

## VI.

The only question really at issue is, has Collie brought his case within the strict terms of the statute under which alone the Court of Claims has jurisdiction to give him judgment for the proceeds of this cotton?   Rev. Stat., sect. 1074; *Haycraft* v. *United States*, 22 Wall. 92.

Is he "a qualified proprietor," entitled to receive restitution?   *The Vrow Anna*, 5 C. Rob. 163; *Lopez* v. *Burslem*, 4 Moo. P. C. C. 305; Creasy, Int. Law, 517, sect. 488.

No such proof has been or can in fact be made.   The appellant claims that the proclamation of general amnesty is the substitute for and equivalent of such proof.   About the effect of a pardon "in cases where it applies," there is no difference of opinion.   *Carlisle* v. *United States*, 16 Wall. 151.

It does not apply to Collie.

1. It is offered only by the sovereignty to those owing it allegiance.   *Lamar* v. *Browne*, 92 U. S. 187.

2. A pardon is personal.   Collie was not a criminal, liable to

indictment under the laws of the United States, when the proclamation of Dec. 25, 1868, was issued. His property was not seized for forfeiture as that of an offender; therefore, it is not to be restored after the proclamation. *Miller* v. *United States*, 11 Wall. 305. It was seized on account of belligerency, not of crime. Belligerency, as a *status* of individuals or of property, ceased when the war did; but the doctrine of *uti possidetis* applied to property already acquired by the government by capture, unless, and then only, so far as it chose otherwise to provide by statute.

It is only offences against the United States that the President can pardon, *i.e.* crimes. Const., art. 2, sect. 11, c. 1; *Ex parte Bollman*, 4 Cranch, 75; *United States* v. *Hudson*, 7 id. 32; *United States* v. *Coolidge*, 1 Wheat. 415; *United States* v. *Bevans*, 3 id. 336.

Of every pardon there must be an acceptance or performance of its condition where conditional. *United States* v. *Wilson*, 7 Pet. 161; *Armstrong* v. *United States*, 13 Wall. 155; *Ex parte Wells*, 18 How. 307; *Semmes* v. *United States*, 91 U. S. 27; *Knote* v. *United States*, 95 id. 149; *Cook* v. *Freeholders of Middlesex*, 26 N. J. L. 329–331, 334, 339, 341–343, 345, 346; s. c. 27 id. 637; *Deming's Case*, 10 Johns. (N. Y.) 232, 233.

MR. CHIEF JUSTICE WAITE delivered the opinion of the court.

Beyond all doubt, the late rebellion against the government of the United States was a sectional civil war; and all persons interested in or affected by its operations are entitled to have their rights determined by the laws applicable to such a condition of affairs. It is equally beyond doubt that, during the war, cotton, found within the Confederate territory, though the private property of non-combatants, was a legitimate subject of capture by the national forces. We have many times so decided, and always without dissent. *Mrs. Alexander's Cotton*, 2 Wall. 404; *United States* v. *Padelford*, 9 id. 531; *Sprott* v. *United States*, 20 id. 459; *Haycraft* v. *United States*, 22 id. 81; *Lamar* v. *Browne*, 92 U. S. 187.

The authority for the capture was not derived from any particular act of Congress, but from the character of the prop-

erty, — it being "potentially an auxiliary" of the enemy, and constituting a means by which they hoped and expected to perpetuate their power. As was well said by the late Chief Justice in Mrs. Alexander's case (*supra*), where this question first arose: "Being enemies' property, the cotton was liable to capture and confiscation by the adverse party. It is true that this rule, as to property on land, has received very important qualifications from usage, from reasonings of enlightened publicists, and from judicial decisions. It may now be regarded as substantially restricted 'to special cases, dictated by the necessary operation of the war,' and as excluding, in general, 'the seizure of the private property of pacific persons for the sake of gain.' The commanding general may determine in what special cases its more stringent application is required by military emergencies; while considerations of public policy and positive provisions of law, and the general spirit of legislation, must indicate the cases in which its application may be properly denied to the property of non-combatant enemies. In the case before us, the capture seems to have been justified by the peculiar character of the property, and by legislation. It is well known that cotton has constituted the chief reliance of the rebels for means to purchase the munitions of war in Europe. It is a matter of history that, rather than permit it to come into the possession of the national troops, the rebel government has everywhere devoted it, however owned, to destruction. The value of that destroyed at New Orleans, just before its capture, has been estimated at $80,000,000. . . . The rebels regard it as one of their main sinews of war; and no principle of equity or just policy required, when the national occupation was itself precarious, that it should be spared from capture, and allowed to remain, in case of the withdrawal of the Union troops, an element of strength to the rebellion."

No better evidence can be found of the value of cotton as an element of strength to the insurgents than is contained in this record. It there appears that the "chief requirement" of the Confederate government from abroad was warlike supplies, and that an outward cargo of cotton of one-fourth the carrying capacity of a vessel would pay for a full inward cargo of muni-

tions of war, and leave a " very large surplus " to the credit of that government.

As war is necessarily a trial of strength between the belligerents, the ultimate object of each, in every movement, must be to lessen the strength of his adversary, or add to his own. As a rule, whatever is necessary to accomplish this end is lawful ; and, as between the belligerents, each determines for himself what is necessary. If, in so doing, he offends against the accepted laws of nations, he must answer in his political capacity to other nations for the wrong he does. If he oversteps the bounds which limit the power of belligerents in legitimate warfare, as understood by civilized nations, other nations may join his enemy, and enter the conflict against him. If, in the course of his operations, he improperly interferes with the person or property of a non-combatant subject of a neutral power, that power may redress the wrongs of its subject. But an aggrieved enemy must look alone for his indemnity to the terms upon which he agrees to close the conflict.

All property within enemy territory is in law enemy property, just as all persons in the same territory are enemies. A neutral, owning property within the enemy's lines, holds it as enemy property, subject to the laws of war ; and, if it is hostile property, subject to capture. It has never been doubted that arms and munitions of war, however owned, may be seized by the conquering belligerent upon conquered territory. The reason is that, if left, they may, upon a reverse of the fortunes of war, help to strengthen the adversary. To cripple him, therefore, they may be captured, if necessary; and whether necessary or not, must be determined by the commanding general, unless restrained by the orders of his government, which alone is his superior. The same rule applies to all hostile property.

The rightful capture of movable property on land transfers the title to the government of the captor as soon as the capture is complete, and it is complete when reduced to " firm possession." There is no necessity for judicial condemnation. In this respect, captures on land differ from those at sea.

The government of the United States, in passing the Abandoned and Captured Property Act, availed itself of its just

rights as a belligerent, and at the same time recognized to the fullest extent its duties under the enlightened principles of modern warfare. The capture of cotton, and certain other products peculiar to the soil of the Confederacy, had become one of the actual necessities of the war. In no other way could the resources of the enemy be so effectually crippled. In fact, as was said in *Lamar* v. *Browne* (*supra*), "It is not too much to say that the life of the Confederacy depended as much upon its cotton as it did upon its men." "It [cotton] was the foundation upon which the hopes of the rebellion were built."

Under such circumstances, it might have been destroyed, if necessary, as it often was by the insurgents; but as the destruction of property should always be avoided, if possible, Congress provided for its capture, preservation, and sale. In this way, while kept out of the Confederate treasury, it was saved for the purposes of trade and commerce. By this means, the national government acted with double power upon the strength of the enemy: first, by depriving them of the means of supplying the demand for their products; and, second, by lessening the demand. It was to avoid this last effect of the capture that the insurgents preferred to destroy property rather than permit it to fall into the hands of the national forces.

While all residents within the Confederate territory were in law enemies, some were in fact friends. In the indiscriminate seizure of private property, it seemed to Congress that friends might sometimes suffer. Therefore, to save them, it was provided that property, when captured, should be sold, and the proceeds paid into the treasury of the United States. That being done, any person claiming to have been the owner might, at any time within two years after the close of the rebellion, bring suit in the Court of Claims for the proceeds; and on proof " of his ownership of said property, of his right to the proceeds thereof, and that he has (had) never given aid or comfort to the present rebellion," " receive the residue of such proceeds, after the deduction of any purchase-money which may have been paid, together with the expense of transportation and sale of said property, and any other lawful expenses attending the disposition thereof." 12 Stat. 820. As to all persons within the privileges of the act, the proceeds were held in trust, but

as to all others the title of the United States as captor was absolute.    Whoever could bring himself within the terms of the trust might sue the United States and recover, but no one else.

It has been decided that this right of suit was given to the subjects of Great Britain, whose property had been taken, as well as to citizens of the United States.    *United States* v. *O'Keefe*, 11 Wall. 178; *Carlisle* v. *United States*, 16 id. 147. The present claimant was a British subject.

There can be no doubt that the words " aid or comfort " are used in this statute in the same sense they are in the clause of the Constitution defining treason (art. 3, sect. 3), that is to say, in their hostile sense.    The acts of aid and comfort which will defeat a suit must be of the same general character with those necessary to convict of treason, where the offence consists in giving aid and comfort to the enemies of the United States. But there may be aid and comfort without treason; for "treason is a breach of allegiance, and can be committed by him only who owes allegiance, either perpetual or temporary." *United States* v. *Wiltberger*, 5 Wheat. 96.    The benefits of the statute are withheld not for treason only, but for giving aid and comfort as well.    A claimant to be excluded need not have been a traitor : it is sufficient if he has done that which would have made him a traitor if he had owed allegiance to the United States.

This, we think, was the manifest intention of Congress.    It must be remembered that the statute was passed March 12, 1863, in the dark hours of the national cause.    The " Florida " and the " Alabama," built in Great Britain, were then in the midst of their successful cruises against the commerce of the United States.    Nassau, in the island of New Providence, was the principal port of entry of the insurgents for blockade-running purposes, and aid and comfort from those who could not be guilty of treason were being sent in every conceivable form into the Confederacy through every port not sealed against approach by an absolutely effective blockade.    The great object of all was to secure the enormous profits to be realized by an exchange of the " chief requirement " of the enemy for their great staple, cotton.    For this, all risks of capture and confisca-

tion were assumed, and the arm of the rebellion upheld.    That it was the intention of Congress to permit foreign owners of cotton thus acquired to sue the United States for its proceeds, when captured, cannot for a moment be believed.

A non-resident alien need not expose himself or his property to the dangers of a foreign war.    He may trade with both belligerents or with either.    By so doing he commits no crime. His acts are lawful in the sense that they are not prohibited.. So long as he confines his trade to property not hostile or con traband, and violates no blockade, he is secure both in his person and his property.    If he is neutral in fact as well as in name, he runs no risk.    But so soon as he steps outside of actual neutrality, and adds materially to the warlike strength of one belligerent, he makes himself correspondingly the enemy of the other.    To the extent of his acts of hostility and their legitimate consequences, he submits himself to the risk of the war into whose presence he voluntarily comes.    If he breaks a blockade or engages in contraband trade, he subjects himself to the chances of the capture and confiscation of his offending property.    If he thrusts himself inside the enemies' lines, and for the sake of gain acquires title to hostile property, he must take care that it is not lost to him by the fortune of war. While he may not have committed a crime for which he can be personally punished, his offending property may be treated by the adverse belligerent as enemy property.    He has the legal right to carry, to sell, and to buy; but the conquering belligerent has a corresponding right to capture and condemn. He enters into a race of diligence with his adversary, and takes the chances of success.    The rights of the two are in law equal.    The one may hold if he can, and the other seize.

Collie, having been a non-resident alien, was not a traitor; but in his foreign home he seems to have done as much as any one private person could do to aid and assist the insurgents in their struggle for supremacy.    The case shows that, as early as October, 1863, he entered into a contract of copartnership with the government of the State of North Carolina, the sole object of which was to provide the " country " with its " chief requirement " from abroad of warlike supplies, " with regularity, expedition, and economy," and to assist in running out regularly

through the blockade " a quantity of cotton for the State, to enable it to benefit from the very high prices ruling " in Great Britain. During the previous year, he was largely engaged in running the blockade, and supplying the government of the Confederacy with all kinds of munitions of war. He also acted as the agent of the State of North Carolina for the sale in England of its " obligations for the delivery of cotton at the port of Wilmington, or other ports in possession of the Confederate States," sometimes guaranteeing payment. In the following year, he entered into a contract with the government of the Confederate States, to cause to be purchased, and delivered through the blockade, quartermaster's stores and ordnance and medical stores of the value of £200,000, for which he was to be paid, on arrival "in the Confederacy," in cotton at sixpence sterling per pound, adding fifty per cent to the English invoice. For this he was granted special privileges. His cotton was to be shipped "free from any charge or restrictions whatever beyond the . . . existing export tax of one-eighth of a cent per pound," and no steamers were to have priority over his in that service. His "agents, with the necessary staff for attending to his business, are (were) to be allowed the privilege of residing in the Confederacy free from liability to conscription, and every facility is (was) to be allowed them for effectually carrying out the terms of this (the) agreement." During the same year, he sent through the blockade and presented to the government of North Carolina "a new kind of gun, reported to be peculiarly destructive," which he asked the authorities at Wilmington to accept (using his language) " as a ' substitute ' for some of our people, who but for our business would have been doing business in another capacity." This gun was afterwards used by the Confederate authorities, as it was clearly intended by him to be, to. aid the entry of blockade-runners into the port of Wilmington by repelling the pursuing vessels of the United States. At another time he sent two Whitworth guns through the blockade, as a gift from himself, which were accepted by the government and used in its service.

Had these things been done by a citizen of the United States, he would have been guilty of treason; and, had they

been done by the government of which Collie was a subject, it could justly be charged with having been an ally of the enemy. Clearly, Collie was in league with the Confederate government; and, as was said by Mr. Chief Justice Marshall, in *Ex parte Bollman* and *Ex parte Swartwout* (4 Cranch, 75), "All those who perform any part, however minute, or however remote from the scene of action, and who are actually leagued in general conspiracy, are to be considered as traitors." In East's Pleas of the Crown, the same principle is thus stated: "Every species of aid or comfort, in the words of the act, which, when given to a rebel within the realm, would make the subject guilty of levying war, if given to an enemy, whether within or without the realm, would make the party guilty of adhering to the king's enemies." 1 East, P. C. 78. And Mr. Justice Foster, in his Discourse on Treason, says: "Furnishing rebels or enemies with money, arms, or ammunition, or other necessaries, will *prima facie* make a man a traitor." Foster's Crown Law, 217. Mr. Justice Field, in *United States* v. *Greathouse* (4 Sawyer, 472), states the same doctrine in this language: "Wherever overt acts are committed, which in their natural consequence, if successful, would encourage and advance the interests of the rebellion, in judgment of law aid and comfort are given."

If, then, Collie had owed allegiance to the United States, it is clear that, aside from all questions of pardon and amnesty, he would have been excluded from the privileges of the statute under which he claims. His acts were hostile acts, and, as has already been seen, the same rule of exclusion applies to him as an alien, that would if he had been a citizen.

This brings us to inquire as to the effect of the proclamation of pardon and amnesty issued by the President Dec. 25, 1868. 15 Stat. 711. By that proclamation, there was granted to every person, within the scope of the pardoning power of the President, who directly or indirectly participated in the rebellion, "full pardon and amnesty for the offence of treason against the United States, or of adhering to their enemies during the late civil war, with restoration of all rights, privileges, and immunities, under the Constitution and the laws . . . made in pursuance thereof." This was done to "secure per-

manent peace, order, and prosperity throughout the land, and to renew and fully restore confidence and fraternal feeling among the whole people, and their respect for and attachment to the national government, designed by its patriotic founders for the general good."

The President has the constitutional "power to grant reprieves and pardons for offences against the United States, except in cases of impeachment." Art. 2, sect. 2. The pardon is of the offence, and, as between the offender and the offended government, shuts out from sight the offending act. But if there is no offence against the laws of the United States, there can be no pardon by the President.

This court has decided, in reference to the Abandoned and Captured Property Act, that a pardon relieves the owner of captured property from the necessity of proving he did not give aid and comfort to the rebellion, because the pardon is equivalent to actual proof of his unbroken loyalty. The language of the late Chief Justice, speaking for the court, in *United States* v. *Padelford* (*supra*), is, "The law makes the proof of pardon a complete substitute for proof that he gave no aid or comfort to the rebellion." This is now the settled rule of decision here, and is not to be disturbed. As the United States were, during the war, both belligerent and sovereign, they could act in either capacity, and with all the powers of both. A part of their citizens, assuming that their allegiance to their States was superior to that which they owed the United States, rebelled. The nation, as a nation, protested against this assumption, and the two contending parties appealed to arms. The result was in favor of the United States. In a spirit of conciliation, the nation has pardoned those who, owing it allegiance, have made war upon it, and closed the eyes of the government to their offending acts. It was a bounty extended to them for their return to allegiance. Collie, though by reason of his hostile acts an enemy, was not a traitor. He was no offender, in a criminal sense. He had committed no crime against the laws of the United States or the laws of nations, and consequently he was not, and could not be, included in the pardon granted by the President in his proclamation. His offending acts, therefore, have not been shut out, and he and his representa-

tives remain subject to all his original disabilities under the statute.

Property captured during the war was not taken by way of punishment for the treason of the owner, any more than the life of a soldier slain in battle was taken to punish him. He was killed because engaged in war, and exposed to its dangers. So property was captured because it had become involved in the war, and its removal from the enemy was necessary in order to lessen their warlike power. It was not taken because of its ownership, but because of its character. But for the provisions of the Abandoned and Captured Property Act, the title to and the proceeds of all captured property would have passed absolutely to the United States. By that act, however, the privilege of suing for the proceeds in the treasury was granted to such owners as could show they had not given aid or comfort to the rebellion. This was a reward for loyalty, not a punishment for disloyalty. Collie has been deprived of no right he ever had. Neither he nor any one similarly situated has ever been permitted to sue the United States in their own courts upon such a claim. What he asks is not a restoration to a right which he once had, and by his misconduct has lost, but the grant of a privilege which those who have never given aid or comfort to the rebellion, or who, owing allegiance to the United States, have been pardoned for their offence of disloyalty, now possess. He labors under no disability in respect to any right he ever had. What he wants is the grant of a new right.

If his property was captured by the United States, under circumstances which entitled him to require its restoration, the law of nations gave him the right to prosecute his claim through his own government for the loss he sustained. That right was not taken from him by the Abandoned and Captured Property Act. It was open to him from the first moment of the capture. All he had to do was to induce his government to assume the responsibility of making his claim, and then the matter would be "prosecuted as one nation proceeds against another, not by suit in the courts as matter of right, but by diplomatic representations, or, if need be, by war." In such cases, "it rests with the sovereign against whom the demand is

made, to determine for himself what he will do with it. He may pay or reject it; he may submit to arbitration, open his own courts to suit, or consent to be tried in the courts of another nation. All depends upon himself." *United States* v. *Diekelman*, 92 U. S. 520. This was the only right Collie had when his cotton was taken, and the United States have never consented to grant him any other. While the President, by his pardon, may restore lost rights, it has never been supposed that in such a way he can grant new ones.

It may be that foreigners who have given aid and comfort to the enemies of the United States are in equity as much entitled to the privileges of the act as the pardoned enemies themselves; but that is for Congress to determine, and not for us. We have decided that the pardon closes the eyes of the courts to the offending acts, or, perhaps more properly, furnishes conclusive evidence that they never existed as against the government. It is with the legislative department of the government, not the judicial, to say whether the same rule shall be applied in cases where there can be no pardon by the President. A pardon of an offence removes the offending act out of sight; but, if there is no offence in the eye of the law, there can be no pardon. Consequently, the acts which are not extinguished by a pardon remain to confront the actor.

*Judgment affirmed.*

MR. JUSTICE FIELD dissented.