Weldon, J.
delivered the opinion of the court:
This is an extraordinary and important case. It is extraordinary, on account of many matters appearing in its history, and testimony; important because of the large amount of money in controversy; and the questions of law involved in its decision. The attention of the court was occupied, many days in the trial; and counsel have exhausted the resources of great professional ability in the presentation of the law, and evidence. More than two thousand, printed pages of testimony, have been discussed and considered, in the determination of the questions of law, and fact, presented by this record. More than 150 witnesses have been examined, many of whom, have been questioned, to an extent, most unusual in judicial investigation. Many of them, have the highest intelligence, while others have the lowest order of mental capacity. Some, are subject to the influence of a great interest in the result of the cause, while others are impressed by great prejudice, against one side, or the other.
The record discloses, a sharp conflict of testimony, not only between different witnesses; but the testimony of the same witness, taken at different times. It is not strange, that a claim of this magnitude, originating more than a quarter of a century ago, composed of distinct and separate transactions, happening as it is alleged, in different and widely separated localities, dependent upon the knowledge of many persons, should have, in the evidence many contradictions, and conflicts; but it is strange, that the record and trial, should abound with so many insinuations and charges, against the veracity of witnesses, the conduct of parties, and the action of Government agents. It is perhaps unnecessary, that the Court should animadvert upon any of the objectionable features of this proceeding, as exhibited in the record ; they do not Recome important, as the material facts are unaffected by them. They do not taint, or impair the channels, from and through which, we have drawn conclusions of fact, decisive of the issues presented for our determination. The jurisdiction of the Court is dependent on the following statute:
*447 “AN ACT for the relief of the representatives of Sterling T. Austin, deceased.
uBe it enacted by the Senate and House of Representatives of the United States of America in Congress assembled: That the claims of the successors in interest and legal representatives of Sterling T. Austin, deceased, late ol the parish of Carroll, in the State of Louisiana, for cotton taken by the military and civil authorities of the United States, or by either of them, during the years eighteen hundred and sixty-three, eighteen hundred and sixty-four, and eighteen hundred and sixty-five, in the States of Louisiana and Texas, be and the same are hereby referred to the Court of Claims, with full jurisdiction and power in the said court to adjust and settle such claims, and to render a judgment in said cause for the full amount realized by the United States from the sale of such cotton, as shall appear from the evidence to have been so taken by said authorities; and in such action the said representatives shall be entitled to recover as aforesaid, any statute of limitation to the contrary notwithstanding: Provided, however, that it be shown to. the satisfaction of the court that neither Sterling T. Austin, senior, nor any of his surviving representatives, gave any aid or comfort to the late rebellion, but were throughout the war loyal to the Government of the United States.” (March 3, 1883, ch. Ill, 22 Stat. L., 804.)
Under this statute, the claimant filed a petition, alleging the seizure of cotton, in the states of Louisiana, and Texas, amounting in the aggregate to 1950 bales. In the trial of the cause, all cotton was abandoned, except the alleged seizures, at the Three Bayou place, Shreveport, Bush County', Millican and Galveston. For the cotton so seized, as alleged, it is claimed, that the defendants realized the sum of $307,500. By the terms of the law, the Court is empowered to adjust and settle such claims, if the cotton belonged to the decedent, and render a judgment, for the net amount, realized by the United States from the sale of such cotton u Provided however, that it be shown to the satisfaction of the Court, that neither Sterling T. Austin Sen, nor any of his surviving representatives, gave any aid or comfort, to the late rebellion; but were throughout the war, loyal to the Government of the United States.”
The proviso, makes it the duty of the Court, to determine as a preliminary question, whether the decedent, or any of his surviving representatives, gave any aid or comfort to the late rebellion, or were loyal, throughout the war, to the government *448 of the United States. That inquiry, confronts the Court, at the-threshold of its investigation; and must be determined, antecedent to the consideration of any other branch of the case.. If Sterling T. Austin, was not loyal, during the late war, within the meaning of the law as it now exists, then it is wholly immaterial, whether the cotton was seized or not, the power to adjudicate is limited by that inquiry.
His legal condition of loyalty, in relation to the rights of the claimant, under the statute giving us jurisdiction, is to be determined by the law, either without reference to his acts, during the war, or by the law applied to those acts, as determining the question of actual loyalty.
It is contended, that general amnesty, by its own force, makes the full proof of loyalty required by the Special Act — and in support of this contention our attention is directed to several authorities.
On the 25th of December A. D. 1868, the President issued a proclamation in the following words:
“Now therefore be it known that I Andrew Johnson, President of the United States by virtue of the power vested in me by the constitution, and in the name of the Sovereign people of the United States do hereby proclaim and declare unconditionally and without reservation to all and every person who directly or indirectly participated in the late insurrection or rebellion a, full pardon and amnesty for the offense of treason against the United States in adhering to the enemies during the late civil war, with restoration of all rights, privileges, and. immunities under the constitution and laws which have been, made in pursuance thereof.”
This is the last act of clemency, on the part of the general government; and was intended, and did extend to all the full measure of pardon and amnesty.
Under and by virtue of the policy, and effect of this proclamation, there passed to Sterling T. Austin “ all rights, privileges, and immunities” which could by the exercise of executive pardon, in its broadest sense, pass to a citizen of the United States. The question in this connection, is not exactly the legal effect of a general pardon; that effect may be broad and far-reaching, but it may not thereby follow, that the claimant is relieved from proving the personal loyalty of the decedent under ,the proviso of the statute. It is said
*449 “ A pardon reaches both the punishment prescribed for the offense and the gnilt of the offender; and when the pardon is full, it releases the punishment and blots out of existence the guilt, so that, in the eye of the law, the ofender is as innocent as if he had never committed, the offense. If granted before conviction, it prevents any of the penalties and disabilities consequent upon conviction from attaching ; if granted after conviction, it removes the penalties and disabilities, and restores him to all his civil rights; it makes him, as it were, a new man, and gives him a new credit and capacity.’7 (Garland, ex parte, 4 Wall. 33.)
The Supreme Court in determining the legal effect of what is known as the Drake amendment to an appropriation law said:
“ But the language of the provision show s plainly that it does not intend to withhold appellate jurisdiction, except as a means to an end. Its great and controlling purpose is to deny to pardons, granted by the President, the effect which this court had adjudged them to have. The proviso declares that pardons shall not be considered by this court on appeal. We had already decided that it was our duty to consider them, and give them effect in cases like the present, as equivalent to proof of loyalty.” (Klein v. United States, 13 Wall. 250.)
At the time of this decision, the Supreme Court had appellate jurisdiction of judgments of the Court of Claims; and this court exercised all the powers incident to one of the inferior Courts, which by the constitution Congress were authorized to establish; and the Supreme Court, said that the this amendment was not intended to withhold appellate jurisdiction, except as a means to an end. The amendment was held to be void, for the reason that its intent, purpose, and effect was to impair the judicial integrity of the Supreme Court, and thereby lessen the constitutional function of one of the co-ordinate branches of the Government.
On the 25th day of December 1868, the term of the Captured and abandoned property Act, within which suits might be brought had expired; and by a joint resolution of Congress passed on the 30th of March 1868, the proceeds of property affected by said act had been covered into the Treasury ” in pursuance to the provisions and requirement of said resolution. (Briggs Ex., &c, v. U. S., ante p. 126).
In the absence of the provisions of said act, the loyal owner of cotton, seized within the dominion and power of the Confederacy, had no legal or equitable claim, on the proceeds of' such *450 cotton, against the right of the United States, to dispose of such proceeds, in such manlier, as in their discretion, might be expedient. In this'connection we cite
“Neither does the pardon affect any rights which have invested in others directly by the execution of the judgment for the offense, or which have been acquired by others while the judgment was in force. If, for exam]tie, by the judgment a sale of the offender’s property has been had, the purchaser will hold the propei ty notwithstanding rhe subsequent pardon. And if the proceeds of the sale had been paid to a party to whom the law has assigned them, they can not be subsequently reached and recovered by the offender. The rights of the parties have become vested, and are as complete as if they were acquired in any other legal way. So, also, if the proceeds have been paid into the Treasury, the right to them has so far become vested in the United States that they can only be secured to the former owner of the property through an act of Congress.
£‘ Moneys once in the Treasury can only be withdrawn by an appropriation by law. However large, therefore, may be the power of pardon vested in the President, and however extended may be its application, there is this limit to it as there is to all his powers, it can not touch moneys in the Treasury of the United States, except expressly authorized by act of Congress. The Constitution places this restriction upon the pardoning power.
“The views here expressed have been applied in practice, it is believed, by the executive departments of the Government in 185(1, and the question was submitted by the Secretary of the Treasury to the Attorney General, whether under a pardon of the President remitting a forfeiture to the United States imposed by a judge of the United States district court, the proceeds of the forfeiture deposited by the marshal in one of the public depositories to the credit of the United States, but not brought into the Treasury by a recovering warrant, could be refunded to the marshal and through him to . the party entitled in execution of the remission granted by the President; and the Attorney-General replied that the pardoning power was completely vested in the President and did not requir e in its exercise any aid from Congress, nor could it be curtailed by Congress, but that if the money had actually passed into the Treasury it could not be refunded without an act of Congress; for the Constitution itself, in the provision that “ no money shall be drawn from the Treasury rJbut in consequence of an appropriation made by law,” opposed as an insuperable obstacle to such a proceeding, and that the provision was of equal efficiency with the pardoning poioer, and operated as a restriction upon it.
*451 “ The effect of a pardon upon the condition and rights of its recipient have been the subject of frequent consideration by this court, and principles have been nettled which will solve the question presented for our determination in the case at bar. (Ex parte Garland, 4 Wall., 333; Armstrong’s Foundry, 6 id., 766; U. S. v. Padelford, 9 id., 531; U. S. v. Klein, 13 id., 128; Armstrong v. U. S., 16 id., 155; Pargoud v. U. S., id., 156; Carlisle v. U. S., 16 id., 147; Osborn v. U. S., 91 U. S., 474.) A pardon is an act of grace by which an offender is released from, the consequences of his offense, so far as such release is practicable and within control of the pardoning power, or of officers under its direction. It releases the offender from all disabilities imposed by the offense, and restores to him all his civil 'rights. In contemplation of law, it so far blots out the offense that afterwards it cannot be imputed to him to prevent the assertion of his legal rights. It gives to him a new credit and capacity, and rehabilitates him to that extent in his former position.
“ But it does not make amends for the past. It affords no relief for what has been suffered by the offender in his person by imprisonment, forced labor or otherwise; it does not give compensation for what has been done or suffered, nor does it impose upon the Government any obligation to give it. The offence being established by judicial proceedings, that which has been done or suffered while they were in force is presumed to have been rightfully done and justly suffered, and no satisfaction for it can be required. * * * So also if the proceeds have been paid into the Treasury, the right to them has so far become vested in the United States, that they can only be secured to the former owner of the property through an act of Congress ” * * Where, however, property condemned, or its proceeds have not thus vested, but remain under the control of the executive, or of officers subject to his orders, or are in custody of the judicial trii.unals, the property will be restored or its proceeds delivered to the original owner, upon his lull pardon.” (Knote v. United States, 95, U. S. 153, 154.)
When the pardon, upon which it is claimed, the decedent was in law made loyal to the United States was issued, the relation of trustee, upon the part of the government towards the proceeds of captured property had ceased by limitation of the statute from which the trust originated, and by covering the proceeds into the Treasury in accordance with the Joint Resolution, 30th March 1868’. (15 Stat. L., 251.) The pardon although general, had no legal effect upon any right which the decedent had in the proceeds of cotton which might have been taken from him during the war. A pardon does not originate rights — it removes penalties and punishment — in the language *452 of the Supreme Court “ it releases the punishment, and blots-out of existence the guilt, so that in the eye of the law, the-offender is as innocent as if he had never committed the of-fence.”
TheOaptured and abandoned propety Act, established a new policy, towards the property of technical public enemies, by providing, for the restoration of the proceeds of property, captured from the loyal citizens, within the territory of the Confederate belligerent} but that policy having terminated, at the end of two years, from the suppression of the insurrection, after the termination, the Government ceased to hold such property, as a trustee; and the same passed to the coutrol, and legal ownership of the government, as captured property, unaffected by any legal or equitable rights, in favor of the original owner.
The effect of general amnesty, proclaimed by the President, on the 25th of December 1868, was to make Sterling T. Austin loyal in law, and so far as his legal rights were concerned, he stood upon an equality with every other citizen of the United States, his rights were similar, neither more nor less. Whatever may have been his conduct during the war, he was forgiven ; and he measured his legal status commensurate with the most loyal adherent of the federal cause. That condition was the result of the general amnesty, which in the exercise of Executive clemency as recognized by the Supreme Court, made him as innocent as if he had never committed the offense. That condition of legal loyalty, was known to Congress when the act of our jurisdiction was passed; and this leads us to examine the force and effect of the proviso forming part of the law.
The condition of legal loyalty, originating from, and dependent upon, the effect of the proclamation of general amnesty, is a condition to be recognized by courts and Congresses, without proof, it is a presumption arising in favor of persons, who either directly, or indirectly, participated in the insurrection, and is not to be shown; but is to be presumed coexistent with the being of the person. When Congress required the claimant “ to show to the satisfaction of the court ” that Sterling T. Austin was loyal to the government of the United States} did they intend, that loyalty arising from general amnesty, should ¡supply the demand of the statute. For the purpose of ascertaining the will of Congress, in this connection, we are asked *453 to look into t-lie circumstances under which the act was passed, and the contemporaneous reasons, which induced its passage. That it is our duty to do so, as contended by the defendants presents to the consideration of the court, grave questions of judicial construction. As to how far a court, may enquire into the parliamentary history of a statute, embracing its passage ■through the legislative department, is a question, on which many decisions have been made not entirely uniform and consistent in their doctrines.
It is said by the Supreme Court:
“ In expounding this law the judgment of the court cannot, in any degree, be influenced by the construction placed upon it by individual members of Congress in the debate which took place on its jiassage nor by the motives or reasons assigned by them for supporting or opposing amendments that were offered. The law, as it passes, is the will of the majority of both Houses, and the only mode in which that will is spoken is the act itself; and we must gather their intention from the language they used, ■comparing it when any ambiguity exists with the" laws upon the same subject, and looking, if necessary, to the public history of the times in which it was passed.” (Aldrich v. Williams. 3. Howard,)
So it is said :
“Nor are we willing to accept the debates that are reported as ■■occurring in Congress at the time of the passage of the deficiency appropriation act of March 3, 1873, as evidence of the meaning of the clause on which the controversy in this case depends.
“The question is whether, according to its correct construction, that clause authorized the parties to execute the agreement into which they entered. (District of Columbia v. Washington Market Co. 108 U. S. 254.)
“A badly expressed and apparently contradictory enactment (such as the one above mentioned) interpreted by reference to the journals of Congress, where it appears that the peculiar phraseology was the result of an amendment introduced without one reference to the language in the original bill. (Blake v. National Banks. 23 Wall. 308.)
“ Courts take judicial notice of some circumstances outside •of an act which go to show its meaning, and in doing so they frequently take a wide range of illustration and investigation from public records, public documents, general and local history, and other matters of such general and public notoriety as may be supposed to have been in the minds of all the legislators when the act was passed, but they never admit the opinions and evidence of individual witnesses for that purpose. (The Slaughter House Cases, 16 Wall., 37; Blake v. National *454 Banks, 23 Wall., 317; Brown v. Piper, 91 U. S. R., 42; Blake v. United States, 103, id., 235; Wilson v. Spalding, 19 Fed. Rep., 304; State v. New Orleans Pacific Railroad, 30 La. Ann., 980; People v. Stevens, 71 N. Y., 527; Fisher v. United States, 15 C. Cls. R., 323; Fendall v. United States, 16 id., 121.) Adam Badeau v. The United States. 21, id., 48.”
It is not sought, in this case, to introduce the Congressional Record for the purpose of showing what the individual'members of Congress said in debate on the passage of the bill; but it is claimed that a report of a committee of the Senate, accompanying the bill, is proper to be considered by the conrt, that being a public document, within the meaning of the decision of this court in the case last cited. It seems to us in view of all the authorities, that a reportof a committee, of either house of Congress, unanimous in its character, submitting and accompanying .an amendment to a bill, may be considered by the court in construing such amendment, in a case of doubtful interpretation. It is an undoubted rule of construction, that the language of a statute is the best and highest criterion of construction ; but where such language fails to perform the function of construction, then other lights may be used, in arriving at a conclusion, as to the intent of the legislature.
The very plausible and forcible arguments, made by counsel on either side of this case, show the necessity of the rule, which we recognize. One contending that the loyalty of the statute, is legal loyalty as it may be termed, which arises from general amnesty; and the other insisting that the statute requires an actual loyalty on the part of Sterling T. Austin, which arises from his adherence to the cause of the United States through the entire period of the war. There is that ambiguity, as indicated from those diverse contentions, which cannot be clearly settled by the terms of the law; and conceding for the sake of argument, in this connection that it was competent under the Constitution, for Congress to limit the jurisdiction of the court by the requirement of actual loyalty, it is proper for us to refer, to a report of the Senate in construing the proviso of the statute of our jurisdiction. In the report of the committee reporting the amendment it is said :
“ From the evidence before the committee the loyalty of the family seems to be well established; yet, in order that this question may not be foreclosed on testimony merely ex parte, *455 your committee recommend that the bill be amended by adding after the last words the following: ‘ Provided, however, That it be shown to the satisfaction of the court that neither Sterliug T. Austin, sr., nor any of his surviving representatives, gave any aid or comfort to the late rebellion, but was throughout the war loyal to the Government of the United States.’
With this amendment our committee report the bill back to the House, with the recommendation that it do pass.”
If any doubt can arise, as to the purpose of Congress, in the enactment of the amendment, it seems to us that the report of the committee, dissipates such doubt, and leaves the intention clear and unquestionable. But is it not clear, from the language used, what Congress intended 1 Presumptions are not proven, but arise from conditions, and if the law in the preservation of the rights of pardon presumed Sterling T. Austin to be loyal within the meaning of the act, then how useless is the requirement u that it be shown to the satisfaction of the court ” that he gave no aid or comfort to the late rebellion.
The meaning of words involves the question of intention, or what sense did Congress intend to use them in any given act.
In Young v. U. S. (97 U. S. R., 62), it was said by Waite, Oh. J.:
“ There can be no doubt that the words 1 aid and comfort’ are used in the statute (the abandoned or captured property act) in the same sense they are in the clause of the Constitution defining treason (Art. 3, sec. 3)..”
The act under consideration was passed in 1883, many years after the decision in Klien’s Case in 1871, and in Young’s Case in 1877. In view of those decisions Congress used the words “ aid and comfort” and it must be assumed that their meaning was intended to be different from that which the Supreme Court had construed them in the abandoned or captured property act, or otherwise the words would have been meaningless and the whole proviso would be without force. It is to be presumed from those facts, as well as from the manner in which the proviso was inserted, that without this important proviso Congress would not have passed the act. .We must so construe it as to give effect to the will of Congress.
It being the opinion of the court, that the proviso intended to require by proof of personal loyalty, that it be shown to the satisfaction of the court, that Sterling T. Austin “ gave no aid *456 or comfort to the late rebellion ” the question arises upon the contention of the claimant, whether Congress had the constitutional right, to attach that requirement to the law, giving the court jurisdiction. It is insisted, that such a requirement, against the legal effect of general amnesty, would be in derogation of the judicial function of the court to render a judgment. That the court being possessed of the power, to act strictly judicial, it must have the right to determine, questions of fact, consistent with its power to act judicially. When Congress, in the exercise of its constitutional prerogative, passed the special statute submitting to the determination of this court, the question of the legal right of the claimant, to recover moneys in the Treasury, it was not legislating upon the rights of person, or property, incident to the claimant, which are the ordinary subjects of judicial investigation; but upon a right, originating and recognized by the very act, to which the condition or proviso is annexed.
The condition of showing the personal loyalty of Sterling T. Austin, is a material and indispensable element, in the fight given by the statute, to have adjudicated the claim for the alleged cotton, the proceeds of which are now as they have been since 1808, a part of the moneys of the United States. If the pardon, incident to the general amnesty, did not affect a right, which the claimant might have had in the proceeds of the cotton, under the captured and abandoned property act, then Congress in the requirement of loyalty in fact, violated no judicial right of property inherent in the claimants. While the Court of Claims, is one of the inferior Courts, contemplated by the constitution, its organization is peculiar in this, that it differs in the subject matter of its jurisdiction, having no power to adjudicate upon the ordinary rights of citizens, and which are preserved and protected, by courts of federal common law jurisdiction.
The consideration of the effect of the proviso, upon the jurisdiction of the court, aside from its effects upon the rights of the parties, may be profitably considered in this collection. The subject matter of litigation is the claim for cotton taken as it is alleged by the military forces of the United States in the State of Louisiana and in the State of Texas by the Treasury agent during the late war, and that claim is referred with full jurisdiction, and power in this court, to adjust and settle *457 such claim, and. to render judgment in said cause “ Provided however that it be shown to the satisfaction of the court that neither Sterling T. Austin, nor any of his surviving representatives, gave any aid or comfort to the late rebellion, but were throughout the war loyal to the government of the United States.” If the court shall determine from all the evidence, that Austin was not loyal, as required by our construction of the proviso, what power if any, can we exercise with reference to the judicial investigation of the claim for the alleged cotton. Without that preliminary finding, we can not settle the claim ” nor 14 render a j udgment.” Is it not therefore a limitation upon the jurisdiction of the court by the requirement of a personal qualification upon the part of the claimant.
In tüe case of Haycraft. v. The United States (22. Wall,) it is said:
“ This case has been argued to some extent as though it involved the statute of limitation. To our minds the question is oneof jurisdiction. A sovereign can not be sued in our courts without his consent; this is an action against the United States in its own Court of Claims. The appellant must, therefore, show that consent has been given to its prosecution 5 that being done the jurisdiction is established and he may proceed; otherwise not.
" Again, on page 95, it is said :
44 But the commencement of the suit within the prescribed time was a condition precedent to the ultimate relief; the right to recovery was made to depend upon the employment of the remedy provided by the act. There was no promise, even under the rulings of that case, exceptas to such as should commence the suit in time, and upon trial be in condition to bring themselves within the requirements of the act! Pardon and-amnesty had no effect except as to such as sue in time.
Again, on page 98, it is said:
14 But the same statute which authorized the capture gave a right to certain persons to demand and receive a restoration of their property taken. Coupled with a right to demand was a provision for the remedy by which it was to be enforced. Both the right and the remedy are, therefore, created by the same statute, and in such casesthe remedy provided is exclusive of all others. The demandant in this case neglected to avail himself of the remedy' provided, and consequently he is without any. That remedy was the only one of which the Court of Claims, or any other court, has been authorized to take jurisdiction. It is for Congress, not the courts, to determine whether this jurisdiction shall be extended and other remedies provided.”.
*458 If Congress, intended by the proviso, to compel the claimant to show, to the satisfaction of the court, that Sterling T. Austin, did not in fact give aid and comfort to the public enemies of the United States, and that requirement is unconstitutional, what effect has the unconstitutionality of that provision, on the remaining parts of the statute ? It does nob follow, that because one provision of the statute is void that all other portions of the law, fail to effectuate the intention and will oí Congress. The rule is succinctly stated in the case of the Packet Company v. Keokuk, (95 U. S. R. 80.)
“ Statutes which are constitutional in part only will be upheld and enforced so far as they are not in conflict with the constitution, provided that the allowed and prohibited parts are severable.” (Balsom v. Franks, 120. U. S. R. 678. Presser v. Illinois, 116. U. S. R. 252. Warren et al v. Mayor & Alderman of Charleston, 2 Gray 84. State Ex. Rel. Walsh v. Dousman 13. Wis. 541.)
Can the proviso be separated in its effect from the other portions of the statute"! Is it severable within the meaning of the rule prescribed by the Supreme Court 1 The proviso in' this c,ase does not operate upon a portion of the act; but avoids in a certain contingency the whole, by way of defeasance, so that it is impossible to sever it from other portions of the law. It was intended, and does in express terms, qualify the precedingportions of the act. If in legislating upon a gratuitous right, Congress imposes a condition which is unconstitutional as applied to a vested or conceded right, the whole act must fail to accomplish the purpose.
Courts have held, that parties are estopped, from denying the constitutionality of a local statute, by participating in the procurement of its passage, and the enjoyments of its benefits. (Moran v. Com, of Miami County, 2 Black, 272. Ferguson v. Landram, 5, Bush, 230.) Courts are extremely reluctant to declare au act unconstitutional, and never do so except from absolute necessity of construction. Upon this point the Supreme Court have said (19, Wall. 673)
“ It is an axiom in American jurisprudence that a statute is not to be pronounced void upon this ground [of unconstitutionality) unless therepugnancy to the Constitution be clear and the conclusion that it exists inevitable. Every doubt is to be resolved in support of the enactment. The particular clause of the Constitution must be specified and the act admit of no reasonable construction in harmony with its meaningÍ The judicial function involving such a• result is one of delicacy, and to be exercised always xoifh caution.1''
*459 And in Livingston County v. Darlington (101, U. S., 410), it is said—
“ The question whether a law be void for its repugnancy to the Constitution is, at all times, a question of much delicacy,, which is seldom, if ever, to be decided in the affirmative in a doubtful case. The court, when impelled by duty to render such a judgment, would be unworthy of its station could it be unmindful of the solemn obligations which that station imposes. But it is not on slight implication and vague conjecture that the legislature is to be pronounced to have transcended its powers and its acts to be construed as void. The opposition between the Constitution and the law should be such that the judge feels a clear and strong conviction of their incompatibility with each other.”
The result is, that we are compelled to hold, that the statute-in this, case requires, the claimant to show that her decedent, was loyal in fact, and that proof, from general amnesty, is not equivalent to the proof required by the proviso of the statute. This construction, remits the court to the inquiry, whether from the facts established by the testimony, the decedent is shown to have been loyal throughout the war to the government of the United States. Upon this branch of the case, we have not found simply, the ultimate fact of loyalty or disloyalty ; but have found a series of facts, so. that the law, may determine as a legal result, whether from all the facts established* the decedent was loyal or disloyal.
The court has found substantially the following facts:
The claimant is the administratrix of Sterling T. Austin, deceased, who before and at the time of his death in 1879, resided in Carroll Parish, in the State of Louisiana. At the time of his death, he was 64 years old, and was born in the State of South Carolina, where he resided until he was seven years old when with his parents he removed to the State of Georgia. He was married in the State of Georgia.
In 1861, he had a family, consisting of his wife, son, and two daughters, in February of said year he removed with his family, and resided temporarily in the city of New Orleans until about the first of April 1861, when he removed to said parish.
During his residence in the State of Georgia, he acquired, what in that country, was considered a large estate, consisting of slaves, and other property, real and personal. He was a man of thrift, and great energy in business matters.
In the campaign of 1860, supported the Bell and Everett *460 party. His sentiments while in Georgia, just before the war, were adverse to secession; bub he was careful in the expression of his opinion owing to his business relations.
Leaving his wife and family, in New Orleans, in March 1861, he went to Carroll parish, and purchased a large cotton plantation, near the Mississippi Fiver, containing 2380 acres for which he agreed to pay the sum of $47,600,. In the spring of 1861, he removed his family, and a portion of his slaves, and took possession of said plantation, where he resided until the latter part of 1862, or first of 1863.
His slaves, consisting of about 160 persons, were taken to said plantation at different times; but all during 1861. The deed to the plantation bears date of March 21, 1861, said Austin had been in said parish in 1860, but it does not appear that he purchased said plantation at said time.
At the time he became a resident of said parish, the excitement incident to the commencement of the war, was very great; and public meetings were held to induce enlistments, and to stimulate the vigorous prosecution of the war. Austin iñ May or June, attended one of these meetings, held about six miles from his home. Violent and inflammatory speeches were made to induce enlistment; but it does not appear that Austin said anything publicly, it does not appear that his presence caused comment or criticism. He did not express any dissent to the proceedings, or take issue with the purpose or object of the meeting, he was not molested or questioned in any way, as to his feelings or political inclinations.
In 1862, a dinner was given to a company about to start for the confederate army. On the day of the dinner Austin went to a landing near the place of the dinner and while waiting for the boat he went with his family to the place of the dinner. It does not appear that he said anything for or against the object of the meeting. While he personally went where the crowd was he and his family dined with the gentleman at whose house the dinner was given.
In 1861, and 1862, a policy was adopted, in Carroll Parish, by which planters subscribed, the services of negroes to work for persons absent in the army, and that policy became general throughout the State. In the latter part of ¡861 a meeting was -held a short distance from the residence of Mr. Austin, which was the first meeting of that character. Austin attended the *461 meeting; but it does not. appear that he said anything; a subscription was started but it doesuot appear who subscribed.
In March 1862, a captain in the militia, in company with a Confederate soldier and a citizen went to the plantation of Mr. Austin to see what he would do in the way of slave labor for those absent in the army. They found Mr. Austin engaged-with his slaves in the held, the captain liad a brief interview with Mr. Austin but it does not appear what he said.
At the time of the interview, he called one of his slaves, and turned him over to the possession of the captain. The negro was taken, and placed to work, on the plantation of a man who was in the confederate army and remained their several months.
At the time of this transaction, there was great excitement and feeling in the neighborhood, and it would have been unsafe for any person to have refused to comply with the demand for slave labor to assist those in the military service. It does not aptpear, that at the time of the demand, that Mr. Austin protested or objected, or that he made any attempt" to withdraw the slave from the plantation.
In the winter or Spring of 1862, a meeting was held about 8 miles from the residence of Mr. Austin to encourage enlistments in the Confederate army, he attended the meeting. It does not appear that he said anything publicly or in any other manner to assist in the purpose or object of the meeting. It does not appear that his presence excited any attention by way of criticism or commendation.
At the time the federal army, in the prosecution of the war, on the line of the Mississippi river going south, came to Ash-ton’s landing, which was a point near the plantation of Mr.. Austin, the plantation with about 160 slaves was in the possession of the agent of Mr. Austin as hereinafter stated
There was a general order, of the confederate authorities, that on the approach of the Union army the planters should-destroy their cotton, and move further back from the river, with their negroes and other movable property. At said time, the plantation, and slaves, were in the control and under the supervision of an agent of Austin, he being at the time in the state of Georgia. Upon information to said agent, that the gun boats of the United States, were approaching near to Ash-ton’s landing, the said agent removed the said slaves, back from the river, in order that they might not fall within the *462 lines of the federal army. There was no force of the confederate army, at that time near said landing. The first removal of the slaves, was to a place about 18 miles from the Three Bayou place. After the return of Austin, he went to the place, where said slaves had been removed by his agent as aforesaid; Austin made no effort to return the slaves to the plantation. From said point 18 miles from said plantation, Austin removed his slaves to Monroe La.
In August 1862, Austin left home, went to the state of Texas, and from there to the state of Georgia, from the last place he returned as aforesaid, after the removal of his slaves by his agent. The person suggesting the removal was not connected with the confederate authority. After staying some time at Monroe La, Austin removed his slaves to the city of Shreveport, this was some time in the summer of 1863. Shreveport at that time, was an important point of the confederate army, in the state of Louisiana. The confederate government, at that time, was building and repairing gun-boats, for the confederate service at that said point. The slaves of Austin at that time, besides the women and children numbered 60.
During his stay at Shreveport, some of his men were pressed into the confederate service — put to work on the fortifications around said city, and upon the gun boats, which were being made and repaired at said place, said slaves remained in the possession of said Austin at Shreveport, eastern Texas, and at San Antonia until 1865. While at San Antonia Texas, the slaves were hired and paid the proceeds of their labor to Austin. After the surrender of Kirby Smith in 1865, Austin told his slaves that they were free, and advised them to stay where they were.
While at Shreveport, Austin was engaged in buying and selling cotton and goods.
After leaving the Three Bayou place, hereinbefore stated, and while in the city of Shreveport, La., in the year 1863, or 1864, he permitted or authorized his slaves to hire the teams with which they were entrusted belonging to him, and persons having contracts for the delivery of wood to the confederate authorities, hired those teams from the slaves, with the slaves as drivers, and they were used in the delivery of wood to the confederate arsenal.
During the winter of 1863 and 1864 Austin removed a num- *463 her of his slaves to the plantation of a relative about 70 miles from Shreveport. Subsequently during the winter or spring he took those slaves back to Shreveport. The confederate forces were actively engaged in building gun boats and strengthening the defence of the post and slaves of Austin had previously been impressed in such work.
We have given in substantial detail, the material facts shown by the findings, which tend to prove, the legal status of decen-dent during the war; and from those facts we must deduce, the conclusion of fact whether Sterling T. Austin, was, or was not, loyal to the Government of the United States, according to the legal requirement indicated by the preliminary discussion of this opinion. Living as he did, within the territory dominated by the force of the southern confederacy, and in states, assuming to exercise the alleged right of secession, the legal presumption is, that he was disloyal to the United States, and an adherent, to the power of the confederate government. Upon his administrator, rests the burden of showing, to the satisfaction of the Court, that he gave no aid or comfort to the insurgents; but was loyal, ihrongho.ut the war, to the defendants. The presumptions of loyalty are in favor of a person, living in a loyal state, as they are against those, living in an insurrectionary state (Turner v. The United States 3, C. Cls. 403).
If there is a failure of facts, to establish that condition, then the presumption attaching to the decedent, because of his domicil, is not overcome, and that issue must be found in favor of the defendants. (Dothage v. United States 4, C. Cls. 208.)
■ The facts show that Austin at the commencement of the war, resided in the State of Georgia, where he had always lived, and had been identified with that political organization in American politics, which made the enforcement of the law, and the maintainance of the union, the cardinal principle of its faith; and if that theory of political policy, had been sufficiéutly strong, to dictate the course of states, no secession would have been attempted, and no war would have occurred. But that sentiment was powerless, against the prevailing and popular opinion,, in all of the states, in which the-decedent resided during the war; and because of that, he was subjected to a political condition, which he would not have inaugurated, but in which lie tacitly acquiesced., and from which, he made no effort to *464 escape, until the Confederacy was beaten, in the last stronghold of its existance. When the government of the United States, became powerless for his protection, in the state of Georgia and Louisiana, he was not compelb d to jeopard his-life, in senseless adherence to the cause of the federal government, and his yielding to an overpowering force, worked no forfeiture of his rights; but he was under legal obligations, to submit to and accept the protection of the Federal power, as soon as that could be done, consistently with the reasonable safety of himself, and his family.
The secession of the state of Louisiana, and the preparation for war, in all of the seceding states, did not seem to deter him, from large investments, looking to the production of cotton, which in a short time became one of the great resources of confederate credit and power. While the facts found, show a tardy, and somewhat reluctant, acquiescence in the means employed, to assist the confederate cause, by the encouragement of enlistment, and other modes, it does not appear, that during his residence in any of the states, in which he resided during the war, that he suffered any molestation, or personal injury, because of his want of fealty to the cause of the south.
At the time he became a citizen of Carroll Parish, the sentiment of the locality was intensely disloyal, and the evidence shows, that he attended war meetings, not participating in a very responsible way; but attending in seeming accord, with the purpose and object of the meeting. Although he attended several of that kind of meetings, he may have been loyal, and the fact that he was there, in seeming accord, with the purpose of the meeting, is simply competent as tending to prove his disloyalty. His birth, education, and environment, tend to prove his attachment to the southern cause; and while he was opposed to the alleged right, and disbelieved in the expediency of secession, he was devoted, to the perpetuation of slavery, and persisted in that devotion, until the successful result of the war on the part of the federal government, established emancipation as an accomplished fact.
We do not wish to be understood, as holding that his failure to recognize emancipation, as declared by the proclamation, is material evidence upon question of loyalty, it only tends to show, situated as he was, his adherence to the one side or the other. At the time his slaves were removed from the Three- *465 Bayou place, or shortly thereafter, the federal power was identified in the prosecution of the war, with the enforcement ana success of the policy of emancipation, the confederate power, was on the other hand identified with the enforcement and success of the policy of slavery. On the approach of the federal army, on the first of January, 1863, to the domicil of the claimant, he voluntarily by his agent, abandoned his home, with his slaves, because of such approach, and continued to be identified with the confederate cause, until in June 1865, when all hope had vanished of its success. While this act is not conclusive, as to his legal status, it tends in a marked degree, to show his sympathies, as between the contending forces. He was struggling to maintain his legal right to his slaves, and having voluntarily continued his domicile within the territory of the power devoted to the maintenance of that right, it is logical to assume, that he was in accord with the policy of that power, and anxious for its success. At that time, the south was seeking to preserve intact the condition of slavery as a means of confederate success, while the G-overnment sought to disturb and destroy that condition, as a means of federal ascendency in the confederate states. Whether the slave. was to be on one side, or the other of the belligerent line of the armies was a question of stragetic importance as shown by the report of the Secretary of War, made in Dec. 1861, as follows :
“ It is already a grave question what shall be done with those slaves who were abandoned by their owners on the advance of our troops into Southern territory as at Beaufort district in South Carolina. The number left within our control at that point is very considerable, and similar cases will probably occur. What shall be done with them? Can we afford to send them forward to their masters to be by them armed against us or used in producing supplies to sustain the rebellion ? Their labor may be useful to us; withheld from the enemy it lessens his military resources; and withholding them has no tendency to induce the horrors of insurrection, even in the rebel communities. They constitute a military resource; and, being such, that they should not be turned over to the enemy is too plain to discuss. Why deprive him of supplies by a blockade and voluntarily give him men to produce them ?
“ The disposition to be made of the slaves of rebels after the clone of the war can be safely left to the wisdom and patriotism of Congress. The Representatives of the people will unquestionably secure to the loyal slaveholders every right to which they are entitled under the Constitution of the country.”
*466 By the acquiescence of Austin, in the removal of his slaves, from the Three Bayou place, and his continued residence thereafter, within the territory, subject to the actual jurisdiction and control of Confederate power, he afforded an opportunity, to the Confederate belligerents, to use and appropriate the services of his slaves, in the prosecution of the war against the forces and authority of the United States.
He not only sought to keep himself with his slaves within the lines of the Confederate army, but he voluntarily selected the town Shreveport, in the State of Louisiana, which at the time, was a stronghold of the enemies of the United States, and where his slaves, were subjected to the performance of labor', connected with the military operations of the Confederate government. The facts found show, that while at said place in the year 1863 or 1884, he permitted or authorized his slaves, to hire the teams with which they were entrusted, and persons having contracts, for the delivery of wood, to the Confederate authorities, hired those teams from the slaves, and they were used, with the slaves as drivers, in the delivery of wood to t he Confederate arsenal.
The slaves were impressed by the confederate authorities, and made to work in the construction of gun-boats, which were being built, at that place, for the use of the confederate army. It does not appeal’ that the decedent hired his slaves to work on the gun-boats, but that was unnecessary, for the purposes of the military service, as the confederate authorities exercised the power, of subjecting private property, and individual interest, to the public necessity.
When Austin located at the town of Shreveport, he is presumed to have known its character, as a depot of supplies, a place, where the confederate government was engaged in the construction of a naval armament; and the impressment of his slaves was one of the necessary results of his location at that point. Persons are always to be held responsible for the natural and necessary consequence of their acts, and punishments of the severest nature are inflicted as a result of that legal intendment.
It does not appear, that he made any effort to remove his slaves, so that they might not be subject to impressment; but on the contrary, after having taken a portion of them to the State of Texas, they were brought back, and again subjected *467 to the impressment and power, of the confederate authorities at Shreveport, and used as laborers in the construction of gunboats.
In connection with these facts, it is pertinent for us to en-quire, whether within the meaning of the law not only our jurisdiction, but all applicable to the question of loyalty, the decedent “gave any aid or comfort to the late rebellion.” This court has held at the present term in the case of Watson v. The United States (ante p. 116):
“ It is the duty of the plaintiff to establish his loyalty affirmatively by competent evidence, of sufficient weight to overcome the presumption of disloyalty arising from his residence and environment. This would be so in any event without statutory provision, but in addition there is an express direction to the same effect found in section 1074 of the Revised Statutes, which provides:—
“ ‘ Sec. 1074. Whenever it is material in any claim to ascertain whether any person did or not give any aid or comfort to the late rebellion. the claimant asserting theloyalty of any such person to the United States during such rebellion shall be required to prove affimatively that such person did, during said' rebellion, consistently adhere to the United States, and did give no aid or comfort to persons engaged in said rebellion; and the voluntary residence of any such person in any place where, at any time during such residence, the rebel force or organization held sway, shall be prima facie evidence that such person did give aid and comfort to said rebellion and to the persons engaged therein.’
“ This statute requires consistent adherence to the United States, and the Bowman Act requires loyalty ‘ throughout the war; ’ that is,the plaintiff must never at any time during the entire war have failed in his allegiance to the United States. Under these statutes it is not sufficient that plaintiff was at the beginning or at the end of the war favorably disposed towards the United States. The loy alty and adherence must have been continuous tbroughoutthe war, wit houtany interruption at any time, and any one act giving ‘aid or comfort to persons engaged in said rebellion’ will-negative a contention in favor of plaintiff’s loyalty ‘ throughout the war.’ ,
“ Th is statute (Sect. 1074) was passed long before the so-called Bowman Act, under which the case at bar was transmitted here, but it is none the less controlling as declaratory of the law, and as giving the interpretation of the word ‘ loyality ’ when that word is found in subsequent acts of Congress.”
In the inception of the war, and up to the time the decedent left the Three Bayou place, his residence within the territory *468 ■where the “ rebel force or organization held sway ” as expressed in the statute, may have been involuntary, but when he fled, from the approach of the federal army, and kept himself with his family and slaves, within the confederate lines, his residence became voluntary, within the meaning of the statute, and such voluntary residence, is prima-faeie evidence, that he gave aid and comfort to the persons engaged in war with the United States.
This statute required him to adhere to the United States upon his first opportunity, and if he failed to do that, he must be held responsible for the legal consequence of such failure.
lie not only did not adhere to the United States; but upon the contrary, he kept within the Confederate lines, with his person family and property, and whatever benefit could arise from that act of the decedent, it inured to the advantage of those in hostility to the United States, and to that extent,, gave aid and comfort, to those engaged in war with the defendants.
In view of the iaets, disclosed by the findings, in the application of what we regard as the settled principles of law, we hold that it is not shown, to the satisfaction of the court: that Sterling T. Austin was, throughout the war, loyal to the Government of the United States.
Inasmuch as we have found, the decedent disloyal, and have by the theory of this opinion, regarded disloyalty as a qualification or restriction upon the jurisdiction of the court, technically our duty terminates with the finding of that issue for the defendants. But for the purposes of the present trial, we have made a finding on the question of fact, whether the decedent was the owner of cotton, and whether the same was seized, and sold by the United States. In the investigation of those questions, we are confronted by one of the most voluminous record of testimony ever submitted to the court. A record, abounding in almost infinite contradictions of witnesses, and improbable statements of conditions.
That Sterling T. Austin in his life time, labored under a serious embarrassment in his own judgment, in the prosecution of this claim, must be apparent, to any one who dispassionately reads, and considers the facts and circumstances of this case. To him, there must have been one of two conditions, either, he was not able to establish his loyalty, under the captured and *469 abandoned property act, or the claim which is now made, for the large amount of cotton, amounting to more than three times the value of his entire property in 1861, is a mistake, and fabrication. This Court was open to him, until August 20th, 1868; ready to adjudicate the claim, in the freshness of the memory of witnesses, then living, and able to testify with absolute certainty. If cotton was taken from him from the Three Bayou place as alleged, he must have known where it had gone; as it is claimed he had an interview with the officer, who was making a raid, for the purpose of collecting cotton in the vicinity of his plantation.
From the facts and circumstances, indicated by the proof, we conclude that the decedent, was embarrassed by his inability to-establish in this Court his adherence to the United States, as required by law: and from that embarrassment originates his failure, to prosecute the case within this jurisdiction. The claim in the contention of plaintiff, is now limited to five seizures, to wit, at the Three Bayou place, Shreveport, Bush County Texas, Millican, and Galveston. Nearly one-lialf of the claim as now prosecuted, is based on the seizure at Three Bayou place. It is impracticable in this opinion to discuss in detail all the evidence tending to induce a conclusion of fact, we can only deal in general results. So abundant is the testimony, on either side of the case, and so contradictory is the statement of witnesses, that both parties have been able in the trial, to assert the boldest propositions of fact, as to the claim, and the defence.
The briefs and arguments of counsel for the plaintiff, insist that a very large amount of cotton was taken from the Three Bayou place, while the counsel for the defendants, argue from their stand-point, that but a few bales were taken, if any. If tve exclude from our consideration, the testimony of the colored witnesses (which it is insisted was influenced by the agent of the United States) the unsuspected, unimpeached evidence, leaves the matter in grave doubt, as to how much cotton was raised in the seasons of 1861, and 1862. If we take some qf the witnesses, for the claimant and believe them, there is no trouble in finding that between seven and eight hundred bales were raised in the two years preceding the seizure, and upon the other hand, if we take the testimony of the witnesses for the defense (those not involved in the alleged intimidation of *470 tlie agent of the government) we can readily find that but very little cotton was raised in 1801, and 1862.
Counsel can prepare briefs, founded upon extreme views of the construction of testimony; but Courts must predicate judgments upon the reasonable probability of the truth of a case, and reconcile the evidence if possible. In the determination of the question, of the probable amount of cotton, raised before 1803, the Court has considered, the condition, of theThree Bayou place at the time Austin took possession of it, the force both of men and teams which he had the first season, the character of the year 1862 with reference to overflow; and the very conflicting testimony of the different witnesses who have made an examination of the plantation since the commencement of this suit, for the purpose, of determining by an inspection of the ground, the amount in cultivation before the abandonment of the premises, and the testimony of witnesses who swear to the seizure and the amount of cotton on the plantation.
While there is a great conflict in the testimony as to the extent and duration of the overflow of 1862, it is very clear, from the evidence that it was a very wet season and the water materially diminished the product of the land for that year. The condition of the place, at the time it was taken possession of in April 1862, is a very material in determining the result of that year’s crop. There is upon this point, a great conflict between the witnesses offered upon the part of the plaintiff, and if we were to ta.ke the testimony of one of her witnesses we should be compelled to find that the first year there was between two and three hundred acres in cultivation. That witness is not only contradicted by the other testimony in the case, but is to some extent impeached. The best and most valuable indication as to the condition of the land, in the year 1861, is to be found in the testimony of the brother of the decedent who was on the plantation from about the 18th of April 1861, to the 10th of May, and if he is not mistaken, the other witnesses who testify as to the three hundred acres -being in cultivation in the year 1861, are badly mistaken.
It is not necessary to descend into detail, as we have most carefully considered all the testimony in relation to the condition of the plantation in the years 1881, and 1862, the force used in the cultivation the first year of the occupation of the premises ; the necessity for raising other crops besides cotton, and *471 other testimony and have determined as the result of that consideration that there could not have been more than 250 bales raised during those two years. The amount raised of course limits the amount seized by the officers of the defendants. The next seizures in the order of prosecution, are the seizures at: ¡Shreveport and in Hush County.
As to the seizure at Shreveport, there is a sharp conflict of testimony. The witness who swears to hauling the cotton, from where it was stored, is flatly contradicted by the testimony of the agent of the Government, at whose instance he swears he hauled it. Then as to the seizure in Rush County, a very serious doubt arises as to the ownership of that cotton, growing out of the act of the decedent, with reference to that question. But the serious difficulty, attending the prosecution of the claim for the Shreveport and Rush County cotton, grows out of the unsatisfactory proof, as to whether the United States, sold and realized on that cotton (if it was taken) within the meaning of the statute, fixing the liability of the defendants.
The last seizures alleged to have been made, by the agent of the United States, were at the town of Millican and city of Galveston in the summer and autumn of 1865 which seizures are embraced in exhibits A, B, and C, in the testimony of Elias S. Fletcher, who at the time of the seizure, was a commission merchant, doing business at both of said places. The amount embraced in those seizures, belonging to Austin, as claimed, is 256 bales, 72 bales of which he owned as a partner, with Fletcher, Bros and the balance in his own right. It is alleged that C. B. Alexander acting as Treasury agent made the seizures ; that the cotton was sent to blew York and sold, and the proceeds realized by the United States, within the meaning of •the law, giving the claimant a right of action. It would.require, a detailed process of statement, and reasoning, to go through all the testimony, bearing upon the question, as to whether all, or any of those seizures were made as alleged by the plaintiff. The 144 bales embrace.! in exhibit A was the joint property of Fletcher Bros, and Austin. Fletcher Bros, at the time of the seizures, were interested with Alexander, in the collection and seizure of other cotton, under a contract, which he had with the Treasury Department; and if this seizure was made, we have the strange contradiction of one partner seizing the property of his copartner, and confiscating it to *472 tlio benefit of tbe Government of the United States. Besides, the seizure in this transaction, was as to nearly all the cotton, after the responsible connection between Alexander and the defendants had ceased. The claim of the plaintiff as to the seizure in the State of Texas depends upon the testimony of E. S. Fletcher, and if he were disbelieved, in all his testimony, no right of recovery could be maintained upon other portions of the proof. It is conceded, that he is the only witness, as to ■the taking of the property, and that as to a portion of the cotton, he has in two proceedings, testified that it was used in paying expenses, and did not go into the Treasury of the United States. That however, is explained to the satisfaction of the Court. We have carefully considered the testimony, in regard to the -difierent seizures in the State of Texas, and applying the principle, that the burden of proof, rests on the plaintiff, we disallow Exhibits A and B, and allow C, making 110 bales. We find the proceeds of all the cotton seized $59,287. Having found that the decedent was uot “ throughout the war loyal to the Government of the United States ” it is the judgment of the Court that the petition be dismissed.